Jimmy Franklin TYRA, Appellant,

v.

The STATE of Texas, Appellee.

No. 036–94.

Court of Criminal Appeals of Texas.

April 26, 1995.

Greg Merkle, Wichita Falls, for appellant.

Barry L. Macha, Dist. Atty., Ed Lane and John W. Brasher, Asst. Dist. Attys., Wichita Falls, Robert Huttash, State's Atty., Austin, for State.

*OPINION ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW*

MEYERS, Judge.

Appellant was convicted of involuntary manslaughter under former Penal Code section 19.05(a)(2) for accidentally or mistakenly causing the death of an individual by reason of operating a motor vehicle while intoxicated. His punishment was assessed at confinement in the penitentiary for 17 years and a fine of $5,000.00. Because the jury specifically found that appellant used or exhibited a deadly weapon during commission of the offense, the trial judge also made a notation to this effect on the judgment. *See* Tex.Code Crim.Proc. art. 42.12, § 3g(a)(2).

On appeal, appellant argued that a deadly weapon finding is not appropriate under the statute unless the evidence supports a conclusion that the accused actually intended to use an object in such a way as to cause serious bodily injury or death. The Fort Worth Court of Appeals rejected this argument, holding that an object need not be used as a weapon to qualify as one and that any use of an object, whether intentional or not, in such a manner as to cause serious bodily injury or death will authorize a deadly weapon finding under article 42.12, section 3g(a)(2). *Tyra v. State,* 868 S.W.2d 857 (Tex. App.—Fort Worth 1993). We granted appellant's petition for discretionary review to determine whether this holding conflicts with our opinion in *Patterson v. State,* 769 S.W.2d 938 (Tex.Crim.App.1989).

The felony at issue in *Patterson,* possession of a controlled substance, did not require, either expressly or by necessary implication, proof that the accused used or exhibited a deadly weapon. But because the ordinary English phrase "use a deadly weapon during commission of an offense" may mean "arming oneself for protection while committing the offense," we upheld a lower appellate court's conclusion that the evidence was sufficient to prove a deadly weapon had been "used" during Patterson's possession of methamphetamine.

The process according to which we investigated the meaning of the phrase "used or exhibited a deadly weapon" in *Patterson* is routine in our jurisprudence. We proceeded from the premise that terms appearing in the statute law of this State should be "read in context and construed according to the rules of grammar and usage." *Id.* at 940, quoting from Gov't Code § 311.011(a). We then consulted a highly regarded lexicon of the English language for information about the word "use," and found that using something often means "hav[ing] recourse to or enjoyment of [the thing]." It may also mean "put[ting] into action or service[,] apply[ing] to advantage[,] turn[ing] to account[, or simply] utiliz[ing]." Finally, we found that using a thing can mean "carry[ing] out a purpose by means of [the thing]." *Id.* at 941. It was in this latter sense, we decided, that the evidence sufficiently showed Patterson to have used a deadly weapon.

*Patterson* thus construed the phrase "used or exhibited a deadly weapon" by opening it to the broadest possible understanding in context of which it was reasonably susceptible in ordinary English. *See Vernon v. State,* 841 S.W.2d 407, 409–10 (Tex.Crim.App. 1992). Such an understanding includes "*any* employment of a deadly weapon, even its simple possession, if such possession facilitates the associated felony." *Patterson,* 769 S.W.2d at 941, quoting from *Patterson v. State,* 723 S.W.2d 308, 315 (Tex.App.—Austin 1987).

In his brief before this Court, appellant argues that *Narron v. State*, 835 S.W.2d 642 (Tex.Crim.App.1992) and *Ex parte Petty*, 833 S.W.2d 145 (Tex.Crim.App.1992) have construed this language from *Patterson* not merely to mean that facilitation of an "associated felony" is one of the uses to which a deadly weapon can be put, but that a deadly weapon can never be "used" within the meaning of our statutes unless it is "utilized to achieve an intended result, namely, the commission of a felony offense *separate and distinct* from 'mere' possession." *Petty*, 833 S.W.2d at 145; *Narron*, 835 S.W.2d at 644 (emphasis added). While this argument may have some superficial support in the text of those opinions, we decline to read *Narron* or *Petty* quite so expansively.

Each of those cases involved an offense in which the mere possession of a deadly weapon was criminalized. Responding to the argument that *Patterson* permits an affirmative finding of deadly weapon use on the basis of possession alone, we observed in *Narron* and *Petty* that possession of a weapon to facilitate a felony, as in *Patterson*, constitutes the use of that weapon, whereas mere possession of the weapon without putting it to any use or purpose whatsoever does not. Accordingly, we held that a deadly weapon is not necessarily used or exhibited during the commission of offenses such as the possession of a prohibited weapon or the unlawful possession of a firearm by a felon merely because the thing possessed is actually a deadly weapon.

Our opinions in *Narron* and *Petty* thus evince a recognition by this Court that, as a matter of semantics, the phrase "used or exhibited a deadly weapon" does not mean the same thing, or merely the same thing, in ordinary English as "possessed a deadly weapon." They do not stand for the proposition that the phrase "used or exhibited a deadly weapon during commission of a felony offense" necessarily means "used or exhibited a deadly weapon during commission of an offense which does not otherwise require the use or exhibition of a deadly weapon."

In the instant cause, Tyra was convicted of involuntary manslaughter, accidentally killing a man with his pickup truck because he was too drunk to control the vehicle. Our precedents establish that anything, including a motor vehicle, which is actually used to cause the death of a human being is a deadly weapon. *Ex parte McKithan*, 838 S.W.2d 560, 561 (Tex.Crim.App.1992). This is necessarily so because a thing which actually causes death is, by definition, "capable of causing death." Penal Code § 1.07(a)(11)(B) (*now* § 1.07(a)(17)(B)); *Ex parte Beck*, 769 S.W.2d 525, 526–27 (Tex.Crim.App.1989). It follows that Tyra's pickup was undoubtedly a deadly weapon in the instant cause.

Likewise, *Patterson* holds that "use" means having "recourse to or enjoyment" of a thing. It also means putting a thing "into action or service." When the word "use" is understood in either of these senses, according to the rules of grammar and usage as *Patterson* counsels, and the term "deadly weapon" is understood as defined by the Legislature, it is reasonably clear that driving an automobile constitutes the use of it and that driving it in a manner capable of causing death or serious bodily injury constitutes it a deadly weapon. The fact that involuntary manslaughter under former Penal Code section 19.05(a)(2) is a felony offense which, therefore, always involves the use of a deadly weapon does not change the meaning of these words. There is simply nothing in the phrase "used a deadly weapon" to imply that it must always be used to commit an "associated offense."

Had the appellant in this case recklessly caused the death of another by carelessly discharging a firearm in his direction, it is unlikely there would be much dispute about his use of a deadly weapon. But because automobiles are not "manifestly designed, made, or adapted for the purpose of inflicting death or serious bodily injury," it is a little strange to find the use of a deadly weapon in any instance where an automobile, although used with deadly effect, was not used with a deadly purpose. After all, in common parlance, objects designed for other purposes, like kitchen knives, hammers, and automobiles, are not spoken of as weapons at all, let alone deadly weapons, unless purposefully used to fight or contend against others.

But the law prescribes a very different meaning for the word "weapon" as used in the Penal Code and Code of Criminal Procedure, and however unfair or counterintuitive it may seem to apply it in the instant cause, the problem is nevertheless one of policy, not of statutory construction. The Legislature could hardly have been clearer when it provided that adult probation (now community supervision) shall not be available "to a defendant when it is shown that *a deadly weapon as defined in Section 1.07(a)(11), Penal Code,* was used or exhibited during commission of a felony offense[.]" Tex.Code Crim. Proc. art. 42.12, § 3g(a)(2) (emphasis added). The statute expressly includes in the definition of deadly weapons those things which are capable of causing death in the manner of their use, not just those things which are manifestly designed to cause death or which will cause death if used as intended.

This statute may not be a model of specificity. But we cannot say that it is too vague for rational enforcement either. The fact is that the Legislature might not actually have contemplated application of the statute to a variety of circumstances, including those presented here. But the statute on its face does apply to these facts. As the Court emphasized in *Patterson,* "'[u]se,' as a verb, may mean a number of things." 769 S.W.2d at 940. Whether it means mere possession, the question actually presented in *Narron* and *Petty,* may have been a close question. Whether it means driving an automobile recklessly enough to endanger the lives of other people is not. If, therefore, entry of an affirmative finding that appellant used a

deadly weapon to end the life of another motorist seems unwise or unfair in this case, consideration should be given to amending the statute. But it is a poor excuse for setting aside the rational judgment of a jury, properly instructed in the law as it actually is, and as it actually was at the time of appellant's trial.

The judgment of the Court of Appeals is affirmed.

OVERSTREET, J., concurs in the result.

BAIRD, Judge, concurring.

The issue can be stated as follows: is an affirmative finding of the use of a deadly weapon permissible in involuntary manslaughter prosecutions under Tex.Penal Code Ann. § 19.05(a)(2)? The majority ultimately holds that such a finding is permissible. However, because the prolixity of the majority's analysis is more distracting than instructive, I am compelled to write separately.

**I.**

Appellant was convicted by a jury of involuntary manslaughter by accident or mistake resulting from the operation of a motor vehicle while intoxicated. Tex.Penal Code Ann. § 19.05(a)(2).[1] The jury assessed punishment at seventeen years confinement and a $5000 fine. Tex.Penal Code Ann. § 12.33. Additionally, the jury made an affirmative finding that appellant "used" his motor vehicle as a deadly weapon in the commission of the offense.[2] Tex.Code Crim.Proc.Ann. art. 42.18, § 8(b)(3); *and,* art. 42.12, § 3g(a)(2).[3]

---

1. Tex. Penal Code Ann. § 19.05(a)(2) provides:
   (a) a person commits an offense if he:
   (2) by accident or mistake when operating a motor vehicle ... while intoxicated and, by reason of such intoxication, causes the death of an individual.

2. Specifically, the jury found:
   ... appellant ... used a deadly weapon, to-wit: a 1988 Chevrolet pickup truck, that in the manner of its use was capable of causing or did cause serious bodily injury or death to [the deceased], during the commission of the offense.

3. Art. 42.18, § 8(b)(3) provides that
   ... *if the judgment contains an affirmative finding under [art. 42.12, § 3g(a)(2) ],* [the prisoner]

is not eligible for release on parole until his actual calendar time served, without consideration of good conduct time, equals one-half of the maximum sentence or thirty years, whichever is less, but in no event shall he be eligible for release on parole in less than two calendar years. (Emphasis added.)
   Art. 42.12, § 3g(a)(2) provides that an affirmative finding of the use of a deadly weapon may be made
   ... when it is shown that *a deadly weapon* as defined in Section 1.07, Penal Code, *was used or exhibited* during the commission of a felony offense or during immediate flight therefrom, and that the defendant used or exhibited a deadly weapon or was a party to the offense and knew that a deadly weapon would be used or exhibited.... (Emphasis added.)

Resolution of this case centers on the meaning of "use" in the context of a deadly weapon finding under art. 42.12, § 3g(a)(2).

## II.

### A.

The Court addressed the meaning of "use" in the context of a deadly weapon finding in *Patterson v. State*, 769 S.W.2d 938 (Tex.Cr. App.1989). Patterson was arrested in the course of a narcotics raid. As the police entered the residence, Patterson, who was sitting on a sofa, stated "I have a gun right here, but I'm not going to touch it." *Id.*, at 939. The police retrieved a pistol located between Patterson's leg and the sofa. They also retrieved from an end table a wallet containing a large sum of money, a bag containing methamphetamine, miscellaneous drug paraphernalia and several rounds of ammunition which fit the pistol which had been seized. *Ibid.* During Patterson's trial for possession of methamphetamine, the State contended Patterson's possession of the pistol constituted "use" in that the pistol was used to "protect his drugs and to facilitate their possession." *Id.*, at 940. The jury found, and the trial court's judgment reflected, that a deadly weapon was used during the commission of the charged offense. The Court of Appeals affirmed. *Patterson v. State*, 723 S.W.2d 308 (Tex.App.—Austin 1987). We granted review to determine whether the court of appeals erred in defining "use" to mean "any employment of a deadly weapon, even simple possession, if such possession facilitates the associated felony." *Patterson*, 769 S.W.2d at 939.

We initially observed that "*all* felonies are theoretically susceptible to an affirmative finding of the use of a deadly weapon." *Id.*, 769 S.W.2d at 940 (Emphasis in original). We further explained:

... "use" is commonly employed to describe conduct in which the verb's object, again, in this case a deadly weapon, is utilized in order to achieve a purpose. In

Penal Code § 1.07(a)(17) defines a deadly weapon as either:
(A) a firearm or anything manifestly designed, made or adapted for the purpose of inflicting death or serious bodily injury; or

other words, the deadly weapon must be utilized, employed, or applied in order to achieve its intended result: "the commission of a felony offense or during immediate flight therefrom."

*Id.*, 769 S.W.2d at 941. We then went on to explain:

Thus, "used ... a deadly weapon" during the commission of the offense means that the deadly weapon was employed or utilized in order to achieve its purpose.... Therefore, the court of appeals was correct when it stated that "'used ... during the commission of a felony offense' refers certainly to the wielding of a firearm with effect, but it extends as well to *any* employment of a deadly weapon, even its simple possession, if such possession facilitates the associated felony."

*Id.* We upheld the Court of Appeals' conclusion that a rational trier of fact could have found that Patterson "used" the pistol during the commission of the felony offense of possession of the contraband. *Id.*, at 942. The general rule established in *Patterson* may be stated as follows: if a deadly weapon is used or exhibited in order to facilitate the commission of the charged offense, a deadly weapon finding is permissible.

### B.

Notwithstanding the general rule of *Patterson*, affirmative findings of the use of a deadly weapon may not be permissible in cases dealing with *simple* possession of the deadly weapon. *Narron v. State*, 835 S.W.2d 642 (Tex.Cr.App.1992); *and, Ex parte Petty*, 833 S.W.2d 145 (Tex.Cr.App.1992). In *Narron*, we were asked to determine if a deadly weapon finding was permissible in a prosecution for possession of an illegal firearm, Tex. Penal Code Ann. § 46.06. Narron was convicted of possession of a short barrel firearm. Additionally, the jury found, and the trial judge entered, an affirmative finding that a deadly weapon was used in the offense. *Narron*, 835 S.W.2d at 643. On appeal, Nar-

(B) anything that in the manner of its use or intended use is capable of causing death or serious bodily injury.

ron contended the deadly weapon finding was impermissible. *Id.* We agreed:

> This Court has interpreted "use" of a deadly weapon in the context of Article 42.12, § 3g(a)(2), V.A.C.C.P. to include simple possession *if such possession facilitates the associated felony....* Therefore, in order to "use" a deadly weapon for affirmative finding purposes, the weapon must be utilized to achieve an intended result, namely the commission of a felony offense separate and distinct from "mere" possession.

*Id.* 835 S.W.2d at 644. (Emphasis added.)

Similarly, in *Petty,* 833 S.W.2d 145, we considered a deadly weapon finding in a prosecution for unlawful possession of a firearm by a felon, Tex.Penal Code Ann. § 46.05. The affirmative finding was based solely on Petty's unlawful possession of a handgun. In ordering the finding deleted from the judgment, we explained:

> This Court has interpreted "use" of a deadly weapon ... to include simple possession *if such possession facilitates the associated felony.* [citing *Patterson* ] Therefore, in order to "use" a deadly weapon for affirmative finding purposes, the weapon must be utilized to achieve an intended result, namely, the commission of a felony offense separate and distinct from "mere" possession.

*Id.,* at 145. (Emphasis added.) We continued, distinguishing the case from *Patterson.*

> In *Patterson,* we determined that the weapon was "used" to protect drugs. In the present case, the weapon was not "used" in furtherance of any collateral felony. Thus, because there was no associated felony facilitated by [Petty's] possession of the deadly weapon, the holding in *Patterson* dictates that the affirmative finding of the use of a deadly weapon was error.

*Id.,* at 145–146. Thus, *Narron* and *Petty* hold that in a prosecution for possession of a firearm, mere "possession" of the weapon does not constitute its "use" for the purposes of affirmative findings. *Narron,* 835 S.W.2d at 644; *and, Petty,* 833 S.W.2d at 145–146.

### C.

While *Narron* and *Petty* may seemingly conflict with *Patterson,* the three decisions may be harmonized when one considers the unique nature of prosecutions for illegal possession of a firearm. In *Narron* and *Petty,* the "gravamen" of the offenses were possession of a weapon. *Narron,* 835 S.W.2d at 644; *and, Petty,* 833 S.W.2d at 145–146. Thus, the act sought to be punished was the actual possession of a weapon. The weapon was not used to facilitate the charged offense. The offense was complete with the possession. This is not to say that *Narron* and *Petty* preclude an affirmative finding in a prosecution for illegal possession of a firearm where the weapon is employed in some manner in addition to its mere possession. For example, if a felon possessing a firearm exposed the weapon to prevent others from taking it, the weapon would have been "used" for the purposes of a deadly weapon finding. *See e.g., Garner v. State,* 864 S.W.2d 92, 103 (Tex.App.—Houston [1st Dist.] 1993) (defendant's shooting at witness and others supported affirmative finding of deadly weapon in prosecution for possession of firearm by felon). Conversely, if police arrested the felon and subsequently discovered the weapon hidden in the felon's pocket, the weapon would *not* have "used" for the purposes of deadly weapon finding.

### III.

In the instant case, appellant contends his use of the automobile was akin to the mere possession of a weapon in *Narron* and *Petty.* Appellant's Brief, pg. 6. However, I believe the determination of whether a deadly weapon finding is permissible in a prosecution under § 19.05(a)(2) is controlled by *Patterson.* While *Narron* and *Petty* addressed mere possession of a deadly weapon, the act sought to be punished in a prosecution for § 19.05(a)(2) is the *operation* of a motor vehicle while intoxicated which results in a homicide. Thus, a § 19.05(a)(2) prosecution involves the active employment, operation and use of the deadly weapon. The operation of an automobile corresponds with those defini-

tions of "use" discussed in *Patterson.* *Id.,* 769 S.W.2d at 940–941. Moreover, it is noteworthy that the Legislature has employed "use" synonymously with the "operation" of an automobile in the context of the "Unauthorized use of a motor vehicle." *See,* Penal Code § 31.07.

For these reasons, I believe the instant case is controlled by *Patterson* and an affirmative finding of a deadly weapon is permissible in a prosecution under § 19.05(a)(2).

With these comments, I join the majority opinion.

MALONEY, Judge, concurring.

While I join the majority's opinion, based upon a plain language reading of article 42.12 § 3g and the fully incorporated penal code definition of "deadly weapon," I write separately to point out that perhaps it is time for the Legislature to re-examine its goals in the context of article 42.12 § 3g and consider whether those goals are being met under the current reading of that provision.

Article 42.12 § 3g(a)(2) of the Code of Criminal Procedure provides that an affirmative finding of the use of a deadly weapon may be made "when it is shown that a deadly weapon as defined in Section 1.07, Penal Code, was used or exhibited during the commission of a felony offense. . . ." If such a finding is made, the defendant is not eligible for court-ordered community supervision and is not eligible for parole until his actual calendar time served, without consideration of good conduct time, is the lesser of one half of his maximum sentence or thirty years. Tex. Code Crim.Proc.Ann. arts. 42.12 § 3g; 42.18 § 8(b)(3).

Appellant argues in part that "an affirmative finding of the use of a deadly weapon

requires an element of intent or deliberateness on the part of the actor that the object be utilized as a deadly weapon." In other words, the manner of use necessarily includes the notion that the actor intended *the result*—in this case, death. While I am compelled to agree with the majority that appellant's argument is not consistent with a plain reading of the definition of "deadly weapon" under section 1.07, it is consistent with the Legislature's original intent in enacting the deadly weapon finding under section 3g.

There is not a lot to be gleaned from the legislative history of section 3g as to the Legislature's understanding of specific terms within the section. *See Patterson v. State,* 769 S.W.2d 938, 940 (Tex.Crim.App.1989) (stating "[d]irect reference to the evolution of Art. 42.12 § 3g, *supra,* through both houses of the Legislature and conference committee sheds no light on what the Legislature intended to be meant by 'used or exhibited a deadly weapon' and tapes of the legislative debates and committee hearings are equally as barren"); *Polk v. State,* 693 S.W.2d 391, 393 n. 1 (Tex.Crim.App.1985) (noting that record of legislative history for SB 152, the bill that was to become section 3 of article 42.12, "is incomplete" and that intended meaning of specific term within that legislation "is difficult to educe"). However, what legislative history can be found at least illuminates the Legislature's overall purpose in enacting the section.

Before the Senate Subcommittee on Criminal Affairs, Senator Bill Meier, the sponsor of Senate Bill 152 explained that the new provision would have the effect of enhancing the sentences of offenders of violent crimes [1] and offenders who utilized a "deadly weapon" in the commission of their crime. Senate Subcommittee on Criminal Affairs, Transcript of Discussion on SB 152, Feb. 8, 1977,

---

1. The first subsection of the bill provided that a defendant found guilty of certain enumerated offenses would not be eligible for parole until a specified amount of calendar time had been served or for court-ordered community supervision, the same sanctions that applied to a defendant who used or exhibited a deadly weapon under the following subsection. When the bill was enacted the following crimes were enumerated: capital murder, aggravated kidnapping, aggravated rape, aggravated sexual abuse, and aggravated robbery. This subsection was amended in 1993 to add murder and indecency with a child to the list. Acts 1993, 73rd Leg., ch. 900 § 4.01, p. 3718.

at p. 2–3. One individual who testified before the subcommittee stated that the enhancement nature of the bill was intended to send a message to criminals to leave their firearms [2] at home:

> ... the point we are trying to get to when we use the language "used or exhibited" is simply to say that if a person is going to commit an offense, leave that firearm at home. Don't take it with you. Don't have the opportunity to use it; don't exhibit it. Don't be around a firearm if you are going to commit an offense because you know that if you do the offense or the penalty, or the combination of the two would perhaps be more onerous than if you commit the offense without the use of a firearm.

Senate Subcommittee on Criminal Affairs, Transcript of Discussion on SB 152, Feb. 15, 1977, at p. 15; *see also id.* at 17 (another witness testifying against the bill, stated "the intent is to stop people from using weapons in the commission of crime"). An advocate opposing portions of the bill argued against the inclusion of the "exhibited" language, urging that there needed to be "a causation between the weapon and the crime." *Id.* at 18. Senator Meier responded that deletion of the "exhibited" language would render "any deterrent effect of the law totally useless" because "what we want to do is stop the guy from bringing it[, the firearm or deadly weapon,] in the first place." *Id.* at 20. Another person argued against the bill on the ground that there were already substantial deterrents built into the Penal Code to "leave the gun at home or the deadly weapon at home." *Id.* at 23. Responding to that testimony, Senator Meier stated in part:

> ... the purpose of the bill is to ... attempt to deter the commission of those

crimes by insuring that other provisions of the criminal justice system, such as the calculation of good time credit, and such as the obtaining of probation, and such as the time a person is going to be eligible for parole, are denied the persons who commit those serious offenses in those limited circumstances. That is the purpose of the bill.

*Id.* at 24. From this testimony it is clear that one of the primary goals behind the enactment of section 3g was to deter offenders from using guns or other deadly weapons in the commission of crimes—to encourage them to leave their weapons at home. *See also Narron v. State,* 835 S.W.2d 642, 645 (Tex.Crim.App.1992) (Overstreet, J., concurring) (recognizing one reason for affirmative deadly weapon finding under article 42.12 is to act as a deterrent).

Yet, the original deterrent purpose of the legislation is at odds with the reality of the application of section 3g, due largely to what may have been legislative oversight in incorporating the whole of the Penal Code's definition of deadly weapon. Section 1.07 of the Penal Code defines "deadly weapon" as:

> (A) a firearm or anything manifestly designed, made, or adapted for the purpose of inflicting death or serious bodily injury; or
>
> (B) anything that in the manner of its use or intended use is capable of causing death or serious bodily injury.

Under subsection (B) virtually everything has been found to be a deadly weapon and therefore supportive of a deadly weapon finding for purposes of section 3g, including such things as hands, feet, fabric, a sock, the floor, and of course, an automobile.[3] Given that

---

**2.** As enacted, another subsection of 3g provided that upon an affirmative finding that the defendant convicted of a second degree (or higher) felony used or exhibited a firearm and the defendant is granted probation, the court may nevertheless order the defendant confined in the Department of Corrections for not less than 60 days or more than 120 days.

Because both the deadly weapon subsection and the firearm subsection served similar goals,

it appears that they were often referred to interchangeably throughout the subcommittee discussions.

**3.** *See, e.g., Martinez v. State,* 883 S.W.2d 771 (Tex.App.—Ft. Worth 1994, no pet. history)) (**automobile** was deadly weapon in involuntary manslaughter, driving while intoxicated case); *Hill v. State,* 881 S.W.2d 897 (Tex.App.—Ft. Worth 1994, pet. granted) (**metal rods, belts, and locks**

the purpose of section 3g was to deter offenders from bringing weapons with them to use in the commission of crimes, it is difficult to imagine how this goal can be furthered if even the offender's hands or the car he drives is a deadly weapon. This point is well-reasoned in the brief of the amicus curiae:

> The logical rationale for increasing the amount of time required to be served before a prisoner is eligible for parole or early release where an affirmative finding of a deadly weapon has been made is twofold: (1) to act as a deterrent "in order to diminish the danger to human life that could be expected to arise in the circumstances that attend a felony offense when its commission is accompanied by a deadly weapon" [*Narron v. State*, 835 S.W.2d 642, 645 (Tex.Crim.App.1992) (Overstreet, J., concurring)]; and (2) imposing a less lenient range of punishment (by denying probation eligibility and delaying parole eligibility) on the grounds that someone who uses a deadly weapon has a higher degree of culpability than one who doesn't, because of the attendant risk.
>
> Both of these reasons are rational only if the issue of "use" of the object found to be

a deadly weapon involves some element of choice or decision on the part of the actor. To "deter" is defined as "to turn aside, discourage, or prevent from acting by fear or consideration of dangerous, difficult, or unpleasant attendant circumstances or consequences." [citing Websters Third New International Dictionary]. The increased punishment provisions would have no "deterrent" effect unless the actor was provided the choice to use or not to use a deadly weapon. Likewise, the issue of increased culpability is dependent upon an actor's conscious assumption of the real and potential risks to others inherent in the use of an object as a deadly weapon.

> This problem is particularly acute when the scope of "deadly weapon" includes not only "objects" or "instruments", but also hands and feet. If, literally, anything which could or is used to cause death or serious bodily injury is a deadly weapon, the issue of an affirmative finding becomes meaningless, as every case where a death or serious bodily injury occurred would result in an "automatic" deadly weapon finding.

(footnotes omitted).

The incorporation of only subsection (A) of the section 1.07 definition would have been in

used to restrain child from obtaining food were deadly weapons in injury to child by omission case); *Stanul v. State*, 870 S.W.2d 329 (Tex. App.—Austin 1994, pet. granted) (**floor** against which defendant struck victim's head was deadly weapon); *Escobar v. State*, 799 S.W.2d 502 (Tex. App.—Corpus Christi 1990, pet. ref'd) (**baseball bat** was deadly weapon in murder case); *Lozano v. State*, 860 S.W.2d 152 (Tex.App.—Austin 1993, pet. ref'd) (**lighter** used to start fire that killed or badly burned five people was deadly weapon); *Johnson v. State*, 770 S.W.2d 72 (Tex.App.—Texarkana 1989) (**hands and feet** used to strike victim were deadly weapon in murder case), *aff'd*, 815 S.W.2d 707 (Tex.Crim.App.1991); *Roberts v. State*, 766 S.W.2d 578 (Tex.App.—Austin 1989, no pet.) (**truck** was deadly weapon in aggravated assault with deadly weapon case); *Shockley v. State*, 747 S.W.2d 470 (Tex.App.—Houston [1st Dist.] 1988, no pet.) (**fabric or hands** were deadly weapon in murder by strangulation case); *Kirkpatrick v. State*, 747 S.W.2d 521 (Tex.App.—Ft. Worth 1988, pet ref'd) (**hands** were deadly weapon in murder case); *Fegurgur v. State*, 734 S.W.2d 103 (Tex.App.—Austin 1987, no pet.) (**knife or knuckles** were deadly weapon in murder case); *Cervantes v. State*, 706 S.W.2d 685 (Tex.App.—Houston [14th Dist.] 1986, no pet.) (**board** was deadly weapon in aggravated assault

case); *see also State ex rel. Esparza v. Paxson*, 855 S.W.2d 170 (Tex.App.—El Paso 1993, no pet.) (trial court did not have discretion to disregard affirmative finding that **sock** was deadly weapon in strangulation case).

The category of "deadly weapons" has likewise been broadly interpreted in deciding whether the indictment provided sufficient notice that the State would seek a deadly weapon finding. *See, e.g., Ex parte McKithan*, 838 S.W.2d 560 (Tex. Crim.App.1992) (recognizing that motor vehicle can be a deadly weapon in involuntary manslaughter case for purposes of providing notice in indictment); *Pena v. State*, 864 S.W.2d 147 (Tex. App.—Waco 1993, no pet.) (allegation that defendant caused death by cutting victim's throat with "sharp object" was sufficient to give notice that State would seek deadly weapon finding); *Mixon v. State*, 781 S.W.2d 345 (Tex.App.—Houston [14th Dist.] 1989, no pet.) (indictment alleging unknown object used to strangle provided sufficient notice); *Gilbert v. State*, 769 S.W.2d 535 (Tex.Crim.App.1989, no pet.) (allegation that defendant caused serious bodily injury to a child by placing him in hot liquid provided sufficient notice).

line with the Legislature's stated goal in enacting section 3g by providing a deterrent for offenders who are making a choice as to whether or not to leave their deadly weapons at home. By also incorporating subsection (B) of the section 1.07 definition, under which virtually everything has been rendered a deadly weapon, the Legislature effectively thwarted the primary purpose it intended to serve by enacting section 3g. I would urge the Legislature to take a closer look at the intended function of section 3g as it is applied in light of section 1.07.

With these comments I join the opinion of the majority.

CLINTON, Judge, dissenting.

The offense is involuntary manslaughter by accident or mistake when operating a motor vehicle while intoxicated. V.T.C.A. Penal Code, § 19.05(a)(2). The core question of law is whether an affirmative finding that the motor vehicle was used as a deadly weapon is appropriate in such an involuntary manslaughter setting.

## I

### A

The essential facts of the offense determined by the court of appeals are that around midnight January 24, 1992, appellant drove his motor vehicle (a pickup truck) at a high rate of speed, estimated at eighty miles per hour, toward a signal-controlled intersection, "jumping" a median and nearly colliding with another vehicle; closing on the intersection where other vehicles were honoring a red light, he drove his pickup against the rear or middle left side of a motorcycle operated by one William Durbin, with such force that the motorcycle was propelled forward into the rear of another standing vehicle, fatally injuring Durbin. At trial the court submitted a "deadly weapon" issue, and the jury made an affirmative finding that the motor vehicle driven by appellant was a "deadly weapon." *Tyra v. State*, 868 S.W.2d 857, at 859, 860 (Tex.App.—Fort Worth 1993).

### B

From V.T.C.A. Penal Code, § 1.07(a)(11)(B), and decisions by sister appellate courts, the court of appeals opined generally:

"... There is no requirement that the defendant intend to cause serious bodily injury with the deadly weapon. It is sufficient that the instrument, as used by the defendant or as he intended to use it, was capable of causing death or serious bodily injury."

*Tyra v. State*, supra, at 859–860. Accordingly, the court concluded:

"... We hold the *intentional, reckless,* or *negligent* operation of a motor vehicle, while intoxicated, resulting in death or serious bodily injury, will support a finding that the vehicle is a deadly weapon."

*Id.*, at 860.[1] It also held there was sufficient evidence for a rational jury to find that "in the *manner* of its use" the motor vehicle operated by appellant was "*capable of causing death* or serious bodily injury." *Ibid.*

We granted review to examine those determinations and to undertake to settle the important questions of state law thus presented. Tex.R.App.Pro., Rule 200(c)(2).

### II

### A

Section 19.05(a), supra, provides that a person commits an offense if he:

---

1. Along the way the court of appeals excerpted a passage from our opinion in *Ex parte McKithan*, 838 S.W.2d 560, at 561 (Tex.Cr.App.1992). See *Tyra v. State*, supra, at 859–860: "(stating that a 'motor vehicle, in the manner of its use or intended use, is clearly capable of causing death or serious bodily injury and therefore *can be* a deadly weapon,' but *declining to comment* on the sufficiency of the evidence to support the deadly weapon finding in that particular case)." We would simply observe the question in *McKithan* is one of sufficient *notice* that the State would seek to prove the motor vehicle involved was a deadly weapon; sufficiency of evidence was not an issue in that habeas proceeding.

All emphasis above and throughout is supplied by the writer of this opinion unless otherwise indicated.

(1) recklessly causes the death of an individual; or

(2) by accident or mistake when operating a motor vehicle while intoxicated and, by reason of such intoxication, causes the death of an individual.[2]

Article 42.12, § 3g(a)(2), V.A.C.C.P., mandates an affirmative finding when a deadly weapon as defined in V.T.C.A. Penal Code, § 1.07, is "used ... during the commission of a felony[;]" as germane here, "deadly weapon" means "anything that in the manner of its use ... is capable of causing death[.]" *Id.*, 1.07(a)(11)(B).[3] A deadly weapon finding entered in the judgment generates adverse collateral consequences for the convicted defendant.[4]

In related grounds for review appellant questions whether a deadly weapon finding is permissible for a conviction under § 19.05(a)(2) "when a person by accident or mistake when operating a motor vehicle

while intoxicated causes the death of an individual," and contends the court of appeals misconstrued V.T.C.A. Penal Code, §§ 1.07(a)(11)(B) and 19.05(a)(2) in upholding the instant deadly weapon finding. Amicus Curiae claims it is error for the judgment to include such an affirmative finding because "the definition of 'deadly weapon' applicable in this case was already an essential element of the offense."

## B

We were informed by practice commentators that while § 19.05 preserves the analogue to common law involuntary manslaughter, its immediate ancestor is the Model Penal Code; that § 19.05(a)(2) came both from the common law and "the modern legislative judgment that driving while intoxicated is *recklessness per se.*" See Practice Commentary, 2 V.T.C.A. Penal Code 108 (1989).[5] "Section 19.05 defines involuntary man-

---

**2.** The indictment in this cause alleged an offense conformably with § 19.05(a)(2). It also contained a special allegation that "during the commission of the offense [appellant] *used* a deadly weapon, to-wit: a 1988 Chevrolet pickup truck, that *in the manner of its use* was capable of causing and did cause serious body injury and the death of William Durbin." The trial court fully instructed the jury substantially in terms of the indictment, and on criminally negligent homicide as well. The jury convicted appellant of involuntary manslaughter under § 19.05(a)(2), and while assessing punishment made its affirmative finding in like terms.

**3.** Exclude the phrases "or exhibited" and "or intended use" by ellipsis since both are omitted in the indictment, charges and affirmative finding. See note 2, *ante*.

The current definition is similar to that applied under former article 1147(7) P.C.1925 (aggravated assaults, including with motor vehicle) *viz:* "one which, from the manner used, is calculated or likely to produce death or serious bodily injury." See Practice Commentary to § 1.07, 1 V.T.C.A. Penal Code 40 (1989).

**4.** Among others, the judgment entry serves to prevent the trial court from exercising its power under Article 42.12, § 3, to suspend imposition of sentence and place defendant on probation, and also to preclude the Board of Pardons and Paroles from considering good conduct time in determining eligibility for release on parole and from releasing to mandatory supervision under

Article 42.18, § 8(b)(2) and (c), V.A.C.C.P., respectively.

**5.** Former article 802c from which Article 19.05(a)(2) derives provided in pertinent part:

"Any person who drives or operates an automobile or any other motor vehicle ... while such person is intoxicated ... and while so driving and operating [the same] shall through *accident or mistake do another act which if voluntarily done would be a felony*, shall receive the punishment affixed to the felony actually committed."

Acts 1941, 47th Leg., Ch. 507, p. 819, H.B. 73), § 3, at 820; Vernon's Texas Penal Code Annotated 361 (1961).

The Act revamped existing proscriptions on "drunken drivers" by reducing the maximum punishment from incarceration in the penitentiary to a fine and confinement in jail, making a felony offense for a second DWI, and creating the offense prescribed by article 802c, *ante*. Regarding the latter, as the Court has often explained, the legislative purpose was to make elements in former article 42, P.C.1925 (act done by "mistake or accident") applicable to the offense of drunken driving, so that an accused may be charged with certain consequential felony offenses as circumstances demonstrate. *Thomason v. State,* 388 S.W.2d 700, at 701–702 (Tex.Cr. App.1964); *Johnson v. State,* 153 Tex.Cr.R. 59, 216 S.W.2d 573, at 577 (1948) (Act made specific application to offense of drunk driving the constituent elements of article 42; State may elect to prosecute under such theory rather than for mur-

slaughter as a reckless killing, with Subsection (a)(2) defining driving while intoxicated as *recklessness per se.*" *Id.*, at 110. Thus an accused must "cause death *recklessly* " within the meaning of § 6.03 [conscious risk creation] or § 19.05(a)(2) [accident or mistake] to constitute involuntary manslaughter. The Legislature rejected a strained concept of constructive *mens rea*, i.e., "as though intentionally done," see *Greiner v. State*, 157 Tex. Cr.R. 479, 249 S.W.2d 601, at 605 (1952); favoring instead a legislative definition of "*recklessness per se.*" Practice Commentary, supra, at 110.

The Court accepted that explanation of legislative intent, purpose and effect, understanding that § 19.05(a)(2) connotes *recklessness per se*. *Guerrero v. State*, 605 S.W.2d 262, at 264 (Tex.Cr.App.1980) (legislature determined conduct proscribed by § 19.05(a)(2) is "equivalent of 'recklessly' causing death of another" under § 19.05(a)(1)); *Ex parte Ross*, 522 S.W.2d 214, at 218 (Tex.Cr.App. 1975) (involuntary manslaughter committed in either of two ways: recklessly causing death of another *or* by accident or mistake causing death by reason of intoxication while operating a motor vehicle); see *Lewis v. State*, 529 S.W.2d 550, at 552 (Tex.Cr.App. 1975) (specific intent to kill not element of

§ 19.05 offense); *Hardie v. State*, 588 S.W.2d 936, at 938 (Tex.Cr.App.1979) (unnecessary allegation of "knowingly and intentionally" is surplusage properly excluded from jury charge); *Daniel v. State*, 577 S.W.2d 231, at 233 (Tex.Cr.App.1979) ("mistake" and "accident" mean "unintentional"); *Thomason v. State*, 388 S.W.2d 700, at 702 (Tex.Cr.App. 1964) (as used in statute "mistake" and "accident" mean "unintentional"); *Johnson v. State*, 153 Tex.Cr.R. 59, 216 S.W.2d 573, at 578 (1948) (terms used in sense ordinarily understood and mean "unintentional").

The ultimate formulation is articulated in *Harper v. State*, 686 S.W.2d 738 (Tex.App.—Austin 1985), *viz:*

"A finding that the statutory elements of § 19.05(a)(2) have been fulfilled constitutes, *as a matter of law,* a finding of reckless conduct; that is, a finding that the defendant was aware of but consciously disregarded a substantial and unjustifiable risk that by reason of his operation of a motor vehicle while intoxicated he would cause the death of an individual by accident or mistake. [citing *Guerrero v. State,* and *Ormsby v. State,* 600 S.W.2d 782 (Tex. Cr.App.1979), both supra]."

*Id.*, at 741 (emphasis in original). *Accord: Stark v. State*, 643 S.W.2d 187, at 189 (Tex.

der); *McCarthy v. State*, 153 Tex.Cr.R. 149, 218 S.W.2d 190, at 192 (1949) (negligent homicide statute inadequate to meet changing times and new conditions arising from highway traffic; showing accused engaged in drunken driving is necessary preliminary to, *though part of,* felony offense *actually committed* through accident or mistake, including unlawful taking of life); *Simmons v. State*, 145 Tex.Cr.R. 448, 169 S.W.2d 171 (1943) (one prosecuted under article 802c just as guilty of murder as if one had voluntarily killed victim); see *Greiner v. State*, 157 Tex.Cr.R. 479, 249 S.W.2d 601 (1952); see also cases decided under Article 42 prior to enactment of article 802c, e.g., *Totten v. State*, 134 Tex.Cr.R. 62, 113 S.W.2d 194, at 195–196 (1937) (article 42 authorized conviction for homicide committed by accident and mistake while driving intoxicated); *Jones v. State*, 127 Tex.Cr.R. 227, 75 S.W.2d 683, at 684, 686–688 (1934) (article 42 was general statute prescribing particular state of facts applicable to certain offenses actually committed, including certain lesser degrees of homicide).

In *Houston v. State*, 143 Tex.Cr.R. 460, 158 S.W.2d 1004 (1941), the Court compared a pros-

ecution under former article 802c with one pursuant to former article 42, *viz:*

"... If appellant had committed the same act before the effective date of House Bill No. 73, he would be guilty of murder without malice and subjected to a penalty of five years in the penitentiary. Had he committed it after the effective date of House Bill No. 73, he would be guilty of murder without malice and subjected to the same penalty. The *theory of his guilt has been changed* but the same penalty and the same offense is defined and applies to the same act for which he is being tried. Under the former circumstances, he would be guilty of murder without malice because he committed the homicide while committing a felony [DWI]. Presently, he would be guilty of murder without malice under House Bill No. 73, not because the homicide took place while committing a felony but *because it took place while he was driving an automobile upon a public highway while intoxicated.* Article 802c, [supra]."

*Id.*, 158 S.W.2d at 1008.

App.—Austin 1982) (to drive while intoxicated is to drive recklessly as a matter of law; therefore, recklessness need not be alleged), reversed on other grounds 657 S.W.2d 115 (Tex.Cr.App.1983).[6]

## III

### A

In the instant cause, then, the jury found appellant acted with *recklessness per se* in response to instructions in the charge.[7] At the punishment phase pursuant to Article 42.12, § 3g(a)(2), V.A.C.C.P., the court charged the jury to consider whether appellant "used a deadly weapon during the commission of the offense."[8] A motor vehicle is not a deadly weapon *per se*, yet in a particular manner of its use is capable of causing death or serious bodily injury, and thus becomes a "deadly weapon." See *Ex parte McKithan*, supra, at 561.[9] Here the jury found beyond a reasonable doubt that appellant "used a deadly weapon, to-wit: a 1988 Chevrolet pickup truck, that in the manner of

its use was capable of causing and did cause serious bodily injury or death to William Durbin, during the commission of the offense."

In other contexts this Court has indicated as a general proposition that a culpable mental state is not implicated in a deadly weapon inquiry. *Ex parte Franklin*, 757 S.W.2d 778, at 783 (Tex.Cr.App.1988) (factfinder not concerned with actor's intent is using deadly weapon). *Accord: Lozano v. State*, 860 S.W.2d 152, at 156 (Tex.App.—Austin 1993, PDR refused) (finding of specific intent not required); *Roberts v. State*, 766 S.W.2d 578, at 579 (Tex.App.—Austin 1989), no PDR, (intent to cause death not required); see also *Chandler v. State*, 689 S.W.2d 332, at 335 (Tex.App.—Fort Worth 1985, PDR refused) (deadly weapon finding permissible in involuntary manslaughter case under 19.05(a)(1)). Since intent to cause death is not an essential element of involuntary manslaughter prescribed in § 19.05(a)(2), recklessness *per se* sufficing, we see no reason to couple any higher culpable mental state with the "man-

---

**6.** In *Ex parte Ross*, supra, at 218, and again in *Hardie v. State*, supra, at 938, the Court said that under 19.05(a)(2) "involuntary manslaughter can be established without proof of a culpable mental state," thus "a culpable mental state is not an essential element of involuntary manslaughter." Those categorical statements are acceptable as rule of thumb only because 19.05(a)(2) prescribes the essential elements necessary to prove *recklessness per se, viz:* operating a motor vehicle while intoxicated and by reason of such intoxication causes the death of an individual through accident or mistake. The definition of "recklessness" in § 6.03(c) is redundant.

**7.** Specifically, the trial court authorized the jury to find appellant guilty of involuntary manslaughter pursuant to the following instruction:

"Now if you believe from the evidence beyond a reasonable doubt that the defendant ... did then and there operate a motor vehicle while intoxicated, and did by reason of such intoxication cause the death of an individual, namely, William Durbin, through accident or mistake, namely, driving said motor vehicle into the person of the said injured party ... or into a motorcycle driven or operated by the said injured party ... then you will find the defendant guilty of Involuntary Manslaughter, and so say by your verdict."

The jury so found. Compare *Thomason v. State*, supra, at 702 (similar charge substantially tracking former article 802c adequately presented issues).

**8.** After defining "deadly weapon" as alleged, see notes 2 and 3, *ante*, and giving other definitions, the court instructed the jury as follows:

"Now bearing in mind the foregoing instructions, if you believe beyond a reasonable doubt that the defendant ... used a deadly weapon, to-wit: a 1988 Chevrolet pickup truck, that in the manner of its use was capable of causing and did cause serious bodily injury or death to William Durbin, during the commission of the offense you will say so by your verdict[.]"

The jury so said in practically the same terms.

**9.** For example, one who drives a motor vehicle against the person of another may be found to have used the vehicle as a "deadly weapon," thereby permitting the factfinder to infer an element of the offense, intent to kill. See *Palafox v. State*, 484 S.W.2d 739, at 743 (Tex.Cr.App.1972); *Duhon v. State*, 136 Tex.Cr.R. 404, 125 S.W.2d 550, at 552 (1939) (assault with intent to murder by running automobile upon and over victim); see also *Parrish v. State*, 647 S.W.2d 8, at 11 (Tex.App.—Houston [14th] 1982), no PDR (aggravated assault with deadly weapon in manner

ner of using" an alleged deadly weapon. The court of appeals correctly concluded that the jury as factfinder need not determine whether appellant *intended* to cause serious bodily injury in the manner of using his pickup, and thus his contrary contention is without merit.[10] In so far as they present this issue, Grounds 2 and 3 are without merit.

**B**

Appellant bases his principal legal contention on firmer ground. He has asserted throughout this litigation that his conduct does not constitute use of a deadly weapon within contemplation of germane defining statutes reproduced at 805–806, *ante*. Appellant's Brief (court of appeals), at 5, relying on *Patterson v. State*, 723 S.W.2d 308 (Tex. App.—Austin 1987), affirmed 769 S.W.2d 938 (Tex.Cr.App.1987). Still relying primarily on *Patterson v. State*, supra, appellant is supported by an Amicus Curiae, who contends that entering an affirmative finding of a deadly weapon in this cause thereby enhancing the punishment for this kind of involuntary manslaughter is "an impermissible 'double dipping,' as there is no 'associated felony.'" He cites with "see" *Narron v. State*, 835 S.W.2d 642 (Tex.Cr.App.1992), and *Ex parte Petty*, 833 S.W.2d 145 (Tex.Cr.App. 1992).

The premise basing appellant's position is that 19.05(a)(2), unlike most other offenses susceptible to a deadly weapon finding, uniquely prescribes elements that are at once "result specific and cause specific—the exact manner and means of committing the offense is set out in the statute[;]" the offense, unlike other homicide offenses, does not just pro-

vide for a prohibited result, i.e., act causing death of an individual with an accompanying mental state, but rather says "this offense is committed by causing the death of someone by accident while operating a motor vehicle while intoxicated." He reasons as follows, *viz*:

> "The rationale behind making an affirmative finding of a deadly weapon is that the use of such deadly weapon is a factor which aggravates the primary offense. In this instance, however, the use of a motor vehicle to cause death and/or serious bodily injury is not an aggravating factor to the primary offense, but an exact factor of the offense itself."

Brief, at 5–6. The result is "impermissible 'double dipping.'"

The State responds that Amicus Curiae is "mistaken." Enumerating all essential elements of the offense determined in *Daniel v. State*, 577 S.W.2d 231, at 233 (Tex.Cr.App. 1979), the State insists that the statute does not require or identify an element that "the motor vehicle be classified as a deadly weapon;" "[t]hus the actions that constitute the use of a deadly weapon are not an essential element of involuntary manslaughter under 19.05(a)(2)." We are asked to "see" *English v. State*, 828 S.W.2d 33 (Tex.App.—Tyler 1991), no PDR, and to compare *McKithan v. State*, 838 S.W.2d 560 (Tex.Cr.App.1992). State's Brief, at 12–13.

**1**

It is of little moment that the statute fails to "classify" a motor vehicle as a "deadly weapon"—neither does the definition in

of using automobile to inflict serious bodily injuries).

**10.** It does seem reasonable though, that where the manner of using a motor vehicle while intoxicated *et cetera* is recklessness *per se*, the same *mens rea* may also serve to sustain a finding that the vehicle is perforce a deadly weapon. Compare *English v. State*, 828 S.W.2d 33 (Tex.App.—Tyler 1991), PDR refused (finding truck was deadly weapon in commission of offense of driving while intoxicated not rational where no direct evidence defendant operated his vehicle in reckless manner).

In that connection, the more expansive holding by the court of appeals that "intentional" or "negligent" operation of a motor vehicle while intoxicated, resulting in death or serious bodily injury, will support a finding that the vehicle is a "deadly weapon," *Tyra*, supra, at 860, must be taken with some caution. Such "intentional" operation may become applicable to involuntary manslaughter under § 19.05(a)(2), by the statutory dictate that proof of higher culpability than that charged constitutes proof of the lesser. § 6.02(e). "Negligent" operation, however, is a lesser culpability than "recklessness," and thus is not applicable to involuntary manslaughter.

§ 1.07(a)(11)(B), and that a motor vehicle is not a "deadly weapon" *per se* is well established. The real question is whether the Legislature actually intended that the statutory definition be applicable at all to involuntary manslaughter under § 19.05(a)(2), and to answer that I now turn.

2

The current offense of involuntary manslaughter through *recklessness per se* is, as was each of its antecedents in their day, *sui generis.*[11] This kind of involuntary manslaughter is a completely integrated offense; the statute stands on its own terms, without resort to another statute for foundation and elements. Because another offense is not implicated, there is no "associated felony" within contemplation of recent germane decisions of this Court developing that concept. See, e.g., *Patterson v. State,* 769 S.W.2d 938, at 941 (Tex.Cr.App.1989); *Ex parte Petty,* 833 S.W.2d 145 (Tex.Cr.App.1992); *Narron v. State,* 835 S.W.2d 642, at 644 (Tex.Cr.App. 1992).

In *Patterson v. State,* supra, the Court was undertaking to differentiate the terms "use" and "exhibit" in Article 42.12, § 3g(a)(2); it enunciated the proposition that to "use" a deadly weapon during the commission of an offense means that it "was employed or utilized in order to achieve its purpose." *Id.,* at 941. The offense was possession of a controlled substance; the weapon was a loaded .45 caliber revolver located between his leg and the leg of a sofa on which defendant was seated when officers raided the place. The Court approved the rationale of the court of appeals, *viz:* " 'used ... during the commission of a felony offense' refers certainly to the wielding of a firearm with effect, but it extends as well to any employment of a deadly weapon, even its simple possession, if such possession facilitates the associated felony." *Id.,* at 941.

*Narron v. State* and *Ex parte Petty,* both supra, likewise involve offenses of possession of a prohibited weapon (sawed off shotgun) and possession of a firearm (handgun) by a felon, respectively. The State engaged in what Amicus Curiae dubs here "double dipping," in that the prosecutor sought and obtained a deadly weapon finding. In each case the Court deleted the judgment entry because there was no "associated felony" facilitated by the possession of the deadly weapon. *Narron,* at 644; *Petty,* at 145–146.[12]

Application of that theory is even more compelling here. Just as unlawfully possessing a firearm is not to use it "in furtherance of any collateral felony," so operating a mo-

---

11. Once "drunken driving" became a societal concern the Legislature prohibited it; as society discerned that motor vehicles thus driven were causing inordinate numbers of serious bodily injuries and deaths beyond toleration, measures were taken to address the problem. First, there was devised from existing statutes a workable formula to prosecute the perpetrators; second, later when escalating conditions demanded improving the law then extant (essentially because it appeared that many juries were refusing to brand drunken drivers as felons), the Legislature reexamined the initial formulation, amended it and enacted, *inter alia,* former article 802c. See discussion in note 5, *ante,* particularly *Jones v. State* and *Houston v. State.*

Accordingly, prosecutions commonly pursued the offense as a homicide, "murder without malice" or simply "murder." See, e.g., *McCarthy v. State,* 153 Tex.Cr.R. 149, 218 S.W.2d 190, at 193 (1949); *Simmons v. State,* 145 Tex.Cr.R. 448, 169 S.W.2d 171 (1943). Now, of course, the offense is involuntary manslaughter with recklessness *per se.*

12. To be noted is that in *Patterson, Narron* and *Petty* the Court was not concerned with determining whether the respective weapons were deadly in the "manner of use;" a .45 caliber revolver, a sawed off shotgun and a firearm is each a deadly weapon *per se.* The Court was deciding only whether the deadly weapon had been "used" in connection with "an associated felony."

The Court recognized in *McKithan,* supra, a motor vehicle, though not a deadly weapon *per se,* may become one in the manner of its use. It has been so ever since the Legislature denounced, and the Court upheld convictions for, "drunken driving" resulting in death or serious bodily injury. Whereas in past incarnations the resultant death constituted a homicide or other felony proscribed by some other statute, thus implicitly "an associated felony," the Court usually wrote in terms in the applicable statute.

tor vehicle while intoxicated thereby causing death by accident or mistake is a complete offense. Thus using the motor vehicle is an essential element, the *sine qua non* of involuntary manslaughter; it is not being "used" in furtherance of any other felony.

The court's charges to the jury at once sustain this rationale and demonstrate the fallacy of the State's position as well as the flawed conclusion of the court of appeals. Manifestly, the application paragraph in both the main charge and the deadly weapon charge address interrelated ingredients of the same criminal conduct, the latter inevitably dictated by the former. That is, in the manner of operating his pickup while intoxicated and by reason of such intoxication causing the death of William Durbin though accident or mistake by driving into the person of the victim, appellant committed involuntary manslaughter; only the unfortunate consequence of his *recklessness per se* made the pickup a "deadly weapon."

### 3

Though a motor vehicle may be a "deadly weapon" in the manner of its use, it is reasonable to conclude that appellant did not "use" his pickup "to achieve its purpose" (or any purpose) "during the commission of [the] felony offense" of involuntary manslaughter. *Patterson v. State*, supra, at 941.

Indeed, usage of the term with *Patterson*'s gloss is most awkward in this context.[13] The common "purpose" of a motor vehicle is to transport person or property upon a highway. Article 6701d, § 2(a) and (b). To drive a motor vehicle in a proper manner along a public way is to "achieve its purpose." To drive in a manner of *recklessness per se* may create a "substantial and unjustifiable risk," but it cannot fairly be said that in consciously disregarding that risk the driver is still attempting to "achieve" the "purpose" of the motor vehicle (or the "purpose" of "anything"), at least not under the facts here.

Furthermore, for appellant to drive his pickup with *recklessness per se* is to engage in essential conduct elements of the involuntary manslaughter offense itself, not purposely to "use" it concomitantly "during" commission of the offense.

### IV

With its long experience in confronting recurrent heightened incidence of "drunken driving" by 1973, we may attribute to the Legislature considerable knowledge of the problem it sought to resolve and, with full understanding of purpose and objective, taking great care in selecting operative terms (as explained by the commentary, *ante*, at 806–807) to create the unique offense proscribed by § 19.05(a)(2), while contemporaneously modifying the definition of "deadly weapon" then extant. Given those considerations I am satisfied that reasonable construction of relevant statutes today reflects discernable legislative intent, consistent with teachings in *Narron* and *Petty*. Therefore, I would hold that Article 42.12, § 3g(a)(2), V.A.C.C.P., does not contemplate an affirmative finding that a motor vehicle can be "used" as a "deadly weapon" in a prosecution for involuntary manslaughter under § 19.05(a)(2), and to enter such finding in the judgment of conviction is not only inappropriate but also erroneous.

Accordingly, the judgment of the court of appeals should be reversed and the cause remanded to that court for further proceedings, including directions to the trial court to delete from its judgment the "affirmative" finding to the effect that appellant did use a deadly weapon. Because the Court does not, I respectfully dissent.

13. "Purpose" is "[t]hat which one sets before him to accomplish; an end, intention, or aim, object, plan, project." Black's Law Dictionary (Rev. Fourth Ed.1968) 1400. More simply stated, it is "something set up as an object or end to be attained." Webster's New Collegiate Dictionary (1979) 930.