IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






NO. PD-0018-08






ANTONIO SIERRA, Appellant



v.



THE STATE OF TEXAS





ON STATE'S PETITION FOR DISCRETIONARY REVIEW


FROM THE FOURTEENTH COURT OF APPEALS


HARRIS COUNTY





 Keasler, J., delivered the opinion of the Court in which Keller, P.J., Price,
Womack, Johnson, Hervey, and Cochran JJ., joined. Meyers, J., filed a dissenting
opinion in which Holcomb, J., joined.


O P I N I O N 



 The court of appeals held that the evidence was legally insufficient to support the
jury's finding that Antonio Sierra used or exhibited his vehicle as a deadly weapon while
driving intoxicated. (1) We disagree. A rational jury could have found that Sierra drove in a
reckless and dangerous manner during the offense. We therefore reverse and remand this
case to the court of appeals. 

Background

 At approximately 4:30 p.m. on August 20, 2005, Laura Pacheco and her boyfriend,
Hector Salinas Almendarez, were leaving an apartment complex in Houston. As they drove
out of the complex onto Imperial Valley Drive in a small Toyota four-door car, Sierra T-boned the car with his Ford SUV. Imperial Valley Drive is a four-lane, heavily used road
that is separated by a median made of concrete and grass. The entrance and exit of the
apartment complex are located after a slight curve on Imperial Valley Drive and are adorned
with bushes and a wrought iron fence on each side. Sierra's SUV hit the driver's side of the
car, pushing part of it onto the median. When the SUV stopped, it remained pressed against
the driver's side of the car. 

 After the accident, Sierra got out of his truck and began to scream at Pacheco and
Almendarez, blaming them for causing the accident. Almendarez, who was in the
passenger's seat of the car, looked over at Pacheco in the driver's seat. He noticed that she
was bleeding and not moving or talking. Almendarez yelled at Sierra to call for help and
then passed out. Officer T. Triplett with the Houston Police Department arrived at the scene
of the accident a few minutes later and called for an ambulance. Officer Triplett identified
Sierra as the driver of the SVU and smelled a "[s]trong odor of alcohol on his breath." By
the time that Officer Triplett arrived, Almendarez regained consciousness, but Pacheco was
still pinned in the car; she was having difficulty breathing and was convulsing. A tow truck
pulled Sierra's SUV from the car, and emergency personnel removed Pacheco from the car
and took her to the hospital. She remained in the hospital for a month.

 At trial, Almendarez recalled what he saw immediately before the accident. He
testified that Pacheco fully stopped the car and waited for the oncoming traffic to pass before
pulling onto Imperial Valley Drive. Almendarez saw Sierra's SUV traveling south in the
outer lane. He also noticed another car, which was in front of Sierra's SUV, make a right
turn into the apartment complex. At this point, Almendarez lost sight of Sierra's SUV
because the car entering the complex blocked his view. Almendarez then saw Sierra's SUV,
traveling south in the inner lane, right before the crash. Almendarez testified that Sierra
changed lanes because the car in front of him was turning into the complex. He also stated
that the bush at the north side of the entrance to the complex did not block his view of the
traffic heading south. 

 After Pacheco was taken to the hospital, Officer Douglas Wayne Ertons with the
Houston Police Department's accident division arrived at the scene to collect information. 
Officer Ertons initially observed that: the road was dry, there were no skid marks leading up
to the point of impact, there was a gouge in the road near the entrance and exit of the
apartment complex, and there were sideways skid marks leading up to where the car was
resting on the median. Officer Ertons testified that the gouge in the road showed the point
of impact and that the sideways motion of the car's tires created the skid marks leading to the
median. Officer Ertons testified to three possibilities for the lack of any skid marks before
the point of impact: first, that Sierra did not brake; second, that Sierra did not apply the brake
hard enough; or third, that the SUV had antilock brakes and Sierra "applied the brakes but
they would not skid . . . ." At the scene, Officer Ertons spoke to Sierra and asked him to
identify where he was on Imperial Valley Drive when he first saw the car. Based on Sierra's
account, at trial, Officer Ertons stated that an average, undistracted person reacting to the car's
presence under these conditions and traveling at the posted speed limit of thirty-five miles per
hour would be able to come to a complete stop within seventy-one feet of the car. On cross-examination, Officer Ertons conceded that he was uncertain whether Sierra's account of his
location at the time he first saw the car was entirely accurate. Officer Ertons explained that
he did not know whether the Spanish-speaking translator specifically asked Sierra if he was
near, past, or right at the location identified by Sierra. 

 Officer Ertons also calculated the speed of Sierra's SUV at twenty-eight miles per
hour. Qualifying his calculation at trial, Officer Ertons testified that it was inaccurate because
he could not account for the energy or momentum loss from the car striking the median and
then resting on top of the median. Officer Ertons estimated that Sierra was traveling at a
speed between highway and public roadway speeds. When Officer Ertons spoke to Sierra he
"detected an odor" of alcohol, and when he asked Sierra whether he had been drinking or
taking any drugs or narcotics, Sierra told him that he did not use any drugs or drink any
alcohol that day. Finally, Officer Ertons testified that both the bush on the north side and a
car making a right turn into the complex could obstruct the view of a driver turning north out
of the complex. 

 Sierra was arrested for driving while intoxicated (DWI). He failed several field
sobriety tests, and his blood and breath samples revealed that his alcohol concentration, which
registered at approximately .12, exceeded the legal limit of .08. (2) During the field sobriety
tests, performed shortly after 7:00 p.m., Sierra told the administrating officer that he had
thirteen beers the previous night while watching the Astros game. He was also adamant that
the accident was not his fault and said that he was going ten miles per hour under the speed
limit. 

 In April 2006, Sierra was charged with felony DWI. A jury found him guilty and
found that he used his SUV as a deadly weapon during the commission of the offense. The
jury then sentenced Sierra to ten years' imprisonment.

Court of Appeals

 On appeal, Sierra claimed, among other things, that the evidence was legally
insufficient to support the jury's affirmative deadly weapon finding. (3) In doing so, Sierra
maintained that the accident was not his fault. (4) Toward that end, he argued that: "(1) he had
the right of way; (2) he was driving at a moderate rate of speed; (3) both drivers' vision was
obscured by a fence and bushes; (4) prior to collision, [he] applied his brakes and turned to
the left to avoid the collision; and (5) there is no evidence that his intoxication caused or
contributed to the accident." (5) The court of appeals agreed with Sierra and held that there is
no evidence that Sierra "was driving in a reckless, threatening, careless, or dangerous manner,
that he had violated any traffic laws, or that he was otherwise at fault for the collision." (6) The
court determined that the only evidence indicating the manner in which Sierra drove includes
the following: "(1) his speed was below the 35 mile per hour speed limit; (2) there were no
skid marks leading up to the accident; and (3) based on the location that [Sierra] said he first
perceived the danger, [he] should have been able to stop before the collision occurred." (7) 
Consequently, the court ordered the deadly weapon finding deleted from the trial court's
judgment. (8) 

State's Petition for Discretionary Review

 We granted the State's petition for discretionary review to decide whether the court of
appeals applied the wrong legal standard and assumed incorrect facts in reversing and deleting
the jury's affirmative deadly weapon finding. The State argues that requiring a person to
drive in a reckless, threatening, careless, or dangerous manner to sustain a deadly weapon
finding is not the proper legal standard. The State further argues that, even if this standard
is correct, the facts of this case meet the standard; therefore, upholding the deadly weapon
finding in this case will not "open the floodgates to such findings in all felony DWI cases." (9) 
Nevertheless, the State contends that there is no rule of law preventing a deadly weapon
finding in all felony DWI cases. 

Analysis

 Section 49.04 of the Texas Penal Code prohibits a person from operating a motor
vehicle in a public place while in a state of intoxication. (10) "Intoxicated" in Penal Code
Section 49.01(2) is defined as either: "loss of faculties" or "per se" intoxication (i.e., .08 or
more alcohol concentration). (11) "Deadly weapon," as defined in Penal Code Section
1.07(a)(17)(B), means "anything that in the manner of its use or intended use is capable of
causing death or serious bodily injury." (12) An affirmative deadly weapon finding has a
negative impact on a defendant's eligibility for community supervision, parole, and mandatory
supervision. (13) 

 Adopting the reasoning and holding of the Austin Court of Appeals in Mann v. State, (14)
we held that Texas law authorizes a deadly weapon finding in felony DWI cases. (15) The
Austin court rejected Mann's arguments that use of a deadly weapon without an associated
felony will not support a deadly weapon finding and that such a finding is impermissible
because DWI is a misdemeanor offense at its inception. (16) Relying on our decision in Tyra v.
State, where we said that Tyra's vehicle was used as a deadly weapon when he accidentally
or mistakenly caused the death of an individual when driving while intoxicated, (17) the court
held that no associated offense is required under the phrase "used a deadly weapon." (18) The
court also determined that prior convictions used to elevate a misdemeanor DWI to a felony
are "elements of the offense under section 49.09(b);" thus, an affirmative deadly weapon
finding is not unlawful because DWI is a misdemeanor at its inception. (19) Quoting from our
decision in Patterson v. State, (20) the court noted that "[a]ll felonies are theoretically susceptible
to an affirmative weapon finding for the purposes of denial of community supervision and
limitation of parole eligibility." (21) Considering the specific issue before it, the court asked
whether the evidence shows that Mann's vehicle "should be classified as a deadly weapon
because it was capable of causing serious bodily injury or death in a manner of its use or
intended use while [Mann] committed the felony DWI." (22) In making this determination, the
court stated that "evidence that others were endangered" is required; "a hypothetical potential
for danger if others had been present" is not sufficient. (23) The court then found that the
evidence was sufficient because Mann "'almost hit another vehicle head-on'" when he
crossed the center line and an experienced police officer testified that such a collision "was
capable of causing death or serious bodily injury." (24) The court also rejected Mann's claim
that a person must have the specific intent to use an instrument as a deadly weapon based, in
part, on our holding in Walker v. State (25) that "no intent to use the automobile as a deadly
weapon need be shown." (26)

 In this case, we must decide whether, in viewing the evidence in the light most
favorable to the verdict, a rational trier of fact could have found beyond a reasonable doubt
that Sierra used or exhibited his SUV as a deadly weapon when he was driving while
intoxicated. (27) Therefore, we must determine if the manner in which Sierra used his SUV
when driving while intoxicated was capable of causing death or serious bodily injury. (28) In
making this determination in past cases involving a motor vehicle as a deadly weapon, we
have divided this question into two parts: first, we evaluate the manner in which the defendant
used the motor vehicle during the felony; and second, we consider whether, during the felony,
the motor vehicle was capable of causing death or serious bodily injury. (29) 

 Although we have never announced a specific standard for assessing a defendant's
manner of driving, we have, in past decisions, examined whether a defendant's driving was
reckless (30) or dangerous (31) during the commission of a felony. For example, in Tyra v. State,
we characterized Tyra's driving as reckless "enough to endanger the lives of other people"
and said that Tyra was "too drunk to control the vehicle." (32) And in Mann, as noted above, the
evidence showed that Mann "'almost hit another vehicle head-on when [his] vehicle crossed
the center lane." (33) Next, in Cates, we reversed the court of appeals's holding that the evidence
was legally sufficient to sustain the deadly weapon finding because there was no evidence that
Cates drove the truck in a deadly or dangerous manner during the offense of failure to stop
and render aid. (34) Finally, in Drichas, we observed that Drichas, in the course of evading
detention with a vehicle, led law enforcement officers on a fifteen-mile high-speed chase
during which he "disregarded traffic signs and signals, drove erratically, wove between lanes
and within lanes, turned abruptly into a construction zone, . . . and drove down the wrong side
on the highway." (35) Affirming the deadly weapon finding in that case, we said that Drichas's
"manner of using his truck posed a danger to pursuing officers and other motorists that was
more than simply hypothetical." (36)

 In this case, when evaluating the manner in which Sierra was driving while intoxicated,
the court of appeals determined that to affirm a deadly weapon finding, there must be
evidence of: (1) reckless, threatening, careless, or dangerous driving; (2) a violation of any
traffic law; and (3) fault for the collision. Our preceding discussion establishes that some of
the criteria used by the court of appeals include factors that we have found determinative in
prior cases--dangerous and reckless driving and the violation of traffic laws. 

 The State urges us to look beyond a defendant's overt physical actions and rely instead
on the single factor of intoxication, which, in the State's view, is "the most dangerous and
reckless of them all." (37) In support of its argument, the State cites the following statistic from
the Mother's Against Drunk Driving website: "In 2006, an estimated 17,602 people died in
alcohol-related traffic crashes--an average of one every 30 minutes." (38) The court of appeals
rejected this argument, (39) and Sierra argues that we should do the same. But we do not need
to settle that issue today. Our precedent gives us adequate guidance here because, when
reviewing the facts of this case, the court of appeals erred in concluding that Sierra's manner
of driving while intoxicated was not reckless or dangerous. 

 Looking at the evidence in the light most favorable to the prosecution, a rational fact-finder was permitted to conclude that Sierra was driving recklessly or dangerously while
intoxicated. (40) There was no evidence that Sierra attempted to brake before the impact, even
though he told Officer Ertons that he was 247 feet away from the car when he first spotted it. 
Based on Sierra's account, the evidence showed that a normal, undistracted person, who was
driving at the thirty-five mile-per-hour speed limit, would have stopped seventy-one feet
before the car. Therefore, Sierra could have avoided the collision, but he failed to do so, even
though he had ample opportunity to stop before hitting the car. The evidence also established
that Sierra was traveling at a speed between public roadway speeds, which a reasonable jury
could infer meant thirty-five miles per hour from Officer Ertons's testimony, and highway
speeds. Considering all of these facts, a jury could reasonably find that Sierra was speeding
and failed to maintain control his SUV. Therefore, it was reasonable for the jury to conclude
that Sierra's driving was dangerous and reckless while intoxicated.

 Next, we turn to the second inquiry--whether Sierra's SUV was capable of causing
serious bodily injury at the time of the accident. We find that a rational jury was permitted
to answer in the affirmative. The record establishes that the SUV did indeed cause serious
bodily injury to Pacheco. We hold that, viewed in the light most favorable to the verdict, the
evidence is legally sufficient to support the jury's finding that Sierra's SUV was used or
exhibited as a deadly weapon.

Conclusion

 Because the evidence is legally sufficient to support the jury's affirmative deadly
weapon finding, we reverse the part of the court of appeals's judgment deleting the deadly
weapon finding and reinstate it. Further, we remand this case so that the court can consider
Sierra's remaining point of error--whether the evidence is factually sufficient to support the
deadly weapon finding because the court of appeals reversed on legal sufficiency only. 


DATE DELIVERED: April 1, 2009

PUBLISH
1. Sierra v. State, No. 14-06-00528-CR, 2007 Tex. App. LEXIS 6724 (Tex.
App.--Houston [14th Dist.] Aug. 23, 2007). 
2. See Tex. Penal Code Ann. §§ 49.01(1)-(2) (Vernon 2003). 
3. Sierra, 2007 Tex. App. LEXIS 6724, at *1, *4. 
4. Id. at *4-5.
5. Id. 
6. Id. at *8-9.
7. Id. at *8.
8. Id. at *17.
9. State's Br. at 12.
10. Tex. Penal Code Ann. § 49.04(a) (Vernon 2003); State v. Barbernell, 257
S.W.3d 248, 256 (Tex. Crim. App. 2008). 
11. Barbernell, 257 S.W.3d at 249.
12. Tex. Penal Code Ann. § 1.07(a)(17)(B) (Vernon 2003). 
13. Mann v. State, 58 S.W.3d 132, 133 (Tex. Crim. App. 2001); see also Tex. Code
Crim. Proc. art. 42.12 § 3g(a)(2) (Vernon 2006); Tex. Gov't Code Ann. § 508.145
(Vernon Supp. 2007), §§ 508.149, 508.151 (Vernon 2004). 
14. 13 S.W.3d 89, 91-92 (Tex. App.--Austin 2000). 
15. Mann v. State, 58 S.W.3d 132, 132 (Tex. Crim. App. 2001). 
16. Mann, 13 S.W.3d at 91-92.
17. 897 S.W.2d 796, 798-99 (Tex. Crim. App. 1995). 
18. Mann, 13 S.W.3d at 91. 
19. Id. at 92.
20. 769 S.W.2d 938, 940 (Tex. Crim. App. 1989).
21. Mann, 13 S.W.3d at 92.
22. Id.
23. Id.
24. Id. 
25. Id.
26. 897 S.W.2d 812, 814 (Tex. Crim. App. 1995). 
27. Cates v. State, 102 S.W.3d 735, 738 (Tex. Crim. App. 2003) (citing Jackson v.
Virgina, 443 U.S. 307, 319 (1979); Tisdale v. State, 686 S.W.2d 110, 114 (Tex. Crim.
App. 1985) (op. on reh'g)). 
28. See Tex. Penal Code Ann. § 1.07(a)(17)(B). 
29. Drichas v. State, 175 S.W.3d 795, 798 (Tex. Crim. App. 2005) (citing McCain
v. State, 22 S.W.3d 497, 503 (Tex. Crim. App. 2000); (Walker v. State, 897 S.W.2d 812,
814 (Tex. Crim. App. 1995)). 
30. Id.; Tyra, 897 S.W.2d at 799; see also Tex. Penal Code Ann. § 6.03(c)
(Vernon 2003).
31. Cates, 102 S.W.3d at 738-39.
32. 897 S.W.2d at 798-99.
33. 13 S.W.3d at 92.
34. 102 S.W.3d at 738-39.
35. 175 S.W.3d at 797. 
36. Id. at 798.
37. State's Br. at 11.
38. Id. (citing http://ww.madd.org/Drunk-Driving/Drunk-Driving/Statistics.aspx).
39. Sierra, 2007 Tex. App. LEXIS 6724, at *10 n.8; see also Mann, 58 S.W.3d at
133-34 (Johnson J., concurring, joined by Price and Cochran, JJ.).
40. See Cates, 102 S.W.3d at 739.