

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-11-00417-CR

| | | |
|---|---|---|
| William Alan Kennedy | § | From Criminal District Court No. 4 |
| | § | of Tarrant County (1203407D) |
| v. | § | February 28, 2013 |
| | § | Opinion by Justice Gabriel |
| | § | Dissent by Justice Dauphinot |
| The State of Texas | § | (p) |

## JUDGMENT

This court has considered the record on appeal in this case and holds that there was no error in the trial court's judgment. It is ordered that the judgment of the trial court is affirmed.

SECOND DISTRICT COURT OF APPEALS

By_____
Justice Lee Gabriel



# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-11-00417-CR

WILLIAM ALAN KENNEDY                                          APPELLANT

V.

THE STATE OF TEXAS                                                  STATE

----------

FROM CRIMINAL DISTRICT COURT NO. 4 OF TARRANT COUNTY

----------

## MEMORANDUM OPINION[1]

----------

### Introduction

Appellant William Alan Kennedy appeals his conviction for aggravated robbery, challenging in three points the sufficiency of the evidence and his trial counsel's representation. We affirm.

---

[1]*See* Tex. R. App. P. 47.4.

## Background Facts and Procedural History

Carrying a television set he did not pay for, Appellant ran over Walmart employee Bruce Florence on the way out the door. After dropping the television in the collision with Bruce, Appellant went directly to a nearby Target, where he successfully stole another one.[2] Bruce had a serious pre-existing health condition—he was on a waiting list for a liver transplant—and the injuries he received when Appellant pushed him down on the concrete floor put him in the hospital, where he died within a few days. Surveillance camera videos taken from both stores had captured Appellant's image on tape, and he was arrested and tried for aggravated robbery.

At Appellant's trial, a forensic video analyst testified for the State that analysis of the Walmart video revealed that Appellant had pushed Bruce with his hand and had run through him while trying to steal the television.

After considering this and other evidence, the jury found Appellant guilty of aggravated robbery. Punishment was tried before the court. The trial court found the indictment's habitual-offender allegation true and sentenced Appellant to life in prison.

---

[2]Appellant pled guilty to the theft from Target. That case is not before us.

**Effectiveness of Counsel**

In his first point, Appellant complains that his trial attorney rendered constitutionally ineffective assistance by not objecting when the State's forensic video analyst opined that Appellant ran over Bruce while attempting to flee with stolen property. To establish ineffective assistance of counsel, Appellant must show by a preponderance of the evidence that his counsel's representation fell below the standard of prevailing professional norms and that there is a reasonable probability that, but for counsel's deficiency, the result of the trial would have been different. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984); *Davis v. State*, 278 S.W.3d 346, 352 (Tex. Crim. App. 2009). In other words, for his claim of ineffective assistance of counsel to succeed, the record must demonstrate both deficient performance by counsel and resulting prejudice. *Menefield v. State*, 363 S.W.3d 591, 592 (Tex. Crim. App. 2012). An ineffective-assistance claim must be "firmly founded in the record" and "the record must affirmatively demonstrate" the meritorious nature of the claim. *Id.* (quoting *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999)).

In evaluating the effectiveness of counsel under the deficient-performance prong, we look to the totality of the representation and the particular circumstances of each case. *Thompson*, 9 S.W.3d at 813. The issue is whether counsel's assistance was reasonable under all the circumstances and prevailing professional norms at the time of the alleged error. *See Strickland*, 466 U.S. at

3

688–89, 104 S. Ct. at 2065. Review of counsel's representation is highly deferential, and the reviewing court indulges a strong presumption that counsel's conduct fell within a wide range of reasonable representation. *Salinas v. State*, 163 S.W.3d 734, 740 (Tex. Crim. App. 2005); *Mallett v. State*, 65 S.W.3d 59, 63 (Tex. Crim. App. 2001).

Trial counsel "should ordinarily be afforded an opportunity to explain his actions before being denounced as ineffective." *Menefield*, 363 S.W.3d at 593 (quoting *Rylander v. State*, 101 S.W.3d 107, 111 (Tex. Crim. App. 2003)). If trial counsel is not given that opportunity, then the appellate court should not find deficient performance unless the challenged conduct was "so outrageous that no competent attorney would have engaged in it." *Id.* (quoting *Garcia v. State*, 57 S.W.3d 436, 440 (Tex. Crim. App. 2001)). If counsel's reasons for his conduct do not appear in the record and there is at least the possibility that the conduct could have been grounded in legitimate trial strategy, we will defer to counsel's decisions and deny relief on an ineffective-assistance claim on direct appeal. *Garza v. State*, 213 S.W.3d 338, 348 (Tex. Crim. App. 2007); *Ortiz v. State*, 93 S.W.3d 79, 88–89 (Tex. Crim. App. 2002), *cert. denied*, 538 U.S. 998 (2003).

We note that although Appellant filed a motion for new trial, in it he did not challenge the effectiveness of his trial counsel. We also note that there is no record that the motion for new trial was presented to the trial court or that the trial court conducted a hearing on it. Therefore, counsel's reasons for not pursuing

4

every conceivable objection to the State's expert in this case are not expressly addressed in the record.

Still, in this case, counsel's strategy is obvious. In his opening statement counsel told the jurors that they would be able to see for themselves from the video that Appellant did not intentionally run into Bruce, but rather that their "feet trip[ped] over each other." And as the following excerpt from counsel's closing argument makes clear, the strategy of playing the video of Appellant's collision with Bruce "frame by frame" allowed counsel to argue that the State's analyst's testimony is based on "junk science."

> Ladies and gentlemen of the jury, one of the things that came out in this trial is words from Bruce Florence's own mouth. This was a freak accident is what he told Mrs. Florence. And we're going to play that video back for you and stop it frame by frame. And that was not done by the D.A.'s employee who called himself a video expert. Didn't take any pictures for you to say he's viewing this video.

> Why doesn't he have some evidence? It's like junk science. There's no evidence. He's just saying, I see the video and that's the way I see it. Kind of like Detective Moore. I see the video, this is [the] way I see it. Well, you can see it just as good as they can see it. And you can see it even better because we'll slow it down.

> But he provided you no pictures for his basis. He provided you no slower video or frame-by-frame video, and that's junk science. He said you can see what you can see just as good as he can. He's watching the same video set. But you'll see it better because we'll slow it down. He may have slowed it down, too. He didn't testify to that.

Counsel then replayed the video for the jury and acknowledged that it showed, as the State's expert had testified, that Appellant had pushed Bruce with

5

his hand.  But as he suggested in his opening statement, counsel used the video

to argue that Appellant was not guilty of aggravated robbery, only theft, because

he did not intentionally push Bruce down, merely tripped over him:

> Watch him go over to the left and cut off and come back to the right.  And you can certainly see a pushing of the hand.  But you see their feet are close together.  [Appellant] is tripping and falling forward.
>
> And he is guilty today, there's no doubt about that; guilty of felony theft.  We can see that with the intent to steal. . . .  He acquired that TV with intent to steal, just unsuccessful. That's not a defense.  He's guilty of felony theft.  He pled guilty of felony theft yesterday of the Target theft.  So he's not trying to get [off] Scott free here.  He's already got a felony theft yesterday, asking for another felony theft today.

Counsel also noted that the State brought three witnesses to testify about

what they thought the video showed and counsel argued that although the

defense could have hired its own witnesses to testify that Appellant tripped, what

the video actually showed was for the jury to decide.

A strategy is not outrageous simply because it fails to produce an acquittal.

*See Flores v. State*, 18 S.W.3d 796, 800 (Tex. App.—Austin 2000, no pet.).

Here, counsel reasonably could have calculated that the risk of not making the

objections appellate counsel now faults him for not making was outweighed by

the payoff of playing the video for the jury, slowly, frame-by-frame, and arguing

that the State's expert opinion was based on junk science.

Although we need not recognize any strategy behind an attorney's actions

during trial to determine an ineffective-assistance claim, in this case, counsel's

6

strategy is both obvious and reasonable. Moreover, we refuse to second guess counsel's trial strategy simply because it failed to result in an acquittal. *See id.* Accordingly, on the record presented here, we cannot say that Appellant received ineffective assistance; accordingly, we overrule his first point. *See Salinas*, 163 S.W.3d at 740; *Thompson*, 9 S.W.3d at 813.

## Deadly Weapon

In his second point, Appellant claims that the evidence is insufficient to support the jury's finding that he used or exhibited a deadly weapon, whether his hands or the boxed television set. He correctly asserts that there must be evidence in the record to establish that the manner he used or intended to use his hands or the television was capable of causing death or serious bodily injury. Tex. Penal Code Ann. § 1.07(17)(B) (West Supp. 2012) (defining "deadly weapon" as "anything that in the manner of its use or intended use is capable of causing death or serious bodily injury"); *McCain v. State*, 22 S.W.3d 497, 503 (Tex. Crim. App. 2000). Appellant contends, however, that "[o]n the record in this case, there is no evidence supporting a deadly weapon finding."

Both sides agree that, in assessing the sufficiency of the evidence to support a deadly-weapon finding, an appellate court must review all the evidence in the light most favorable to the verdict in order to determine whether any rational trier of fact could have found the finding beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *McCain*, 22 S.W.3d at 503.

7

The State points out that a person who uses a weapon to illegally assault another person must take his victim as he finds them. *See Cuellar v. State*, 957 S.W.2d 134, 140 (Tex. App.—Corpus Christi 1997, pet. ref'd) (noting that it is "axiomatic that a perpetrator of illegal conduct takes his victims as he finds them"); *Zesati v. State*, No. 08-99-00171-CR, 2001 WL 1326898, at *4 (Tex. App.—El Paso Oct. 25, 2001, no pet.) (not designated for publication) (holding that evidence showing appellant threw a seventy-five year old woman to the floor and struck her with his fist was sufficient to prove his hands were deadly weapons). The State argues that given Bruce's serious pre-existing health condition, the evidence is sufficient for a rational factfinder to conclude that Appellant used his hands or the television set in such a manner that they were capable of causing death or serious bodily injury.

The evidence showed that Appellant was thirty-seven years old, six feet tall, and weighed 200 pounds. When he ran into Bruce, he was carrying a boxed 26-inch television set. The collision caused Bruce to fall to the concrete floor and hit his head. When paramedics arrived, they noticed Bruce had bumps and bruises on his head. Bruce's wife testified that Bruce had been feeling pretty good that morning when he went to work, but an officer that arrived after Appellant knocked Bruce to the floor testified that Bruce appeared disoriented.

The medical examiner testified that Bruce's injuries did not significantly contribute to his death—he suffered a skull fracture and a brain bruise with bleeding—but in light of his late-stage liver disease, the push or strike from

8

Appellant that led to his injuries was capable of causing death or serious bodily injury. He also testified as follows:

> Q. [Prosecutor] For someone with a compromised system such as you found with Mr. Florence, are the injuries that you see capable of becoming, therefore, the traumatic brain injury?
>
> A. There was a significant risk that he would continue to bleed at a later time, yes. I think that his demise from his liver— directly from his liver disorder occurred before these injuries developed further.
>
> Q. And, therefore, would the blow that—the push or strike that produces such these injuries be capable of causing death or serious bodily injury, sir?
>
> A. In theory, in a person of his condition, yes.
>
> . . . .
>
> Q. Without reiterating, the injuries that Bruce Florence sustained in his compromised condition, you testified that they were capable of causing death or serious bodily injury given his compromised conditions, correct, sir?
>
> A. He was certainly elevated risk for developing complications that could have been lethal, yes.

The medical examiner further testified that Bruce was at a significant risk for internal bleeding, which could have been precipitated from something as simple as shaking his head, lowering his head to a pillow, or plopping down into a chair. And, as the State points out, the fact that Bruce succumbed to his liver disease before he succumbed to the injuries caused by Appellant running over him does not preclude a rational finding that Appellant used his hands or the television set in a manner capable of causing death or serious bodily injury. The

9

State was not required to show that Bruce actually suffered serious bodily injury, only that Appellant used his hands or the television in a manner that was capable of causing serious bodily injury. *See Tucker v. State*, 274 S.W.3d 688, 691 (Tex. Crim. App. 2008); *Adame v. State*, 69 S.W.3d 581, 582 (Tex. Crim. App. 2002); *Pope v. State*, No. 02-05-378-CR, 2007 WL 866232, at *5 (Tex. App.—Fort Worth Mar. 22, 2007, no pet.) (mem. op., not designated for publication).

In determining whether an object is a "deadly weapon," a jury may consider (1) the physical proximity between the alleged victim and the object, (2) any threats or words used by the accused, (3) the size and shape of the object, (4) the potential of the object to inflict death or serious injury, and (5) the manner in which the accused allegedly used the object. *See Brown v. State*, 716 S.W.2d 939, 947 (Tex. Crim. App. 1986); *Adame*, 69 S.W.3d at 584 (Meyers, J., concurring); *Pope*, 2007 WL 866232, at *5. Here, the jury had the benefit of watching a video that showed how Appellant used his hands or the television set when he collided with Bruce. The evidence showed that Appellant pushed Bruce with his hand as he ran through him carrying a boxed television set, and there was testimony that Appellant placed his hand directly on Bruce's chest as he did so. The proximity factor, therefore, weighs in favor of the deadly-weapon finding. There is no evidence of any threats or words used by Appellant; the only eyewitness is deceased, and the videotaped recording of the event had no audio. Regarding size of the object and its potential to inflict death or serious bodily injury, Appellant is not a small man; he stood between five feet eleven inches

10

and six feet tall, and weighed approximately 200 pounds.  The television had a twenty-six inch screen, and there was no testimony regarding its weight.  Still, the jury could reasonably conclude that a man of Appellant's size, carrying a television set while running into another man of compromised health could mete out serious injury with his hands or the set.  Finally, regarding the manner in which Appellant allegedly used his hands or the television set, he ran into Bruce, who was sickly, and pushed him down to a concrete floor, where he hit his head, became disoriented, and had to go to the hospital, where he died a few days later.  Viewed in the light most favorable to the verdict, a rational jury could have combined the evidence from the video and the testimony of the witnesses, including that of the medical examiner, to conclude that Appellant used a deadly weapon.  We hold, therefore, that the evidence in this case is sufficient to sustain the jury's deadly-weapon finding.  *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Adame*, 69 S.W.3d at 582; *McCain*, 22 S.W.3d at 503.  Accordingly, we overrule Appellant's second point.

## Serious Bodily Injury?

In his third point, Appellant claims that the evidence is also insufficient to support the jury's finding that Appellant caused Bruce serious bodily injury.  He asserts that he "was indicted for and convicted of Aggravated Robbery with a Serious Bodily Injury."

Appellant was not charged with nor found guilty of causing serious bodily injury.  The two-count indictment, the pertinent parts of which are set out below,

11

charged that Appellant committed aggravated robbery (theft, bodily injury, and a television or his hands as deadly weapons) and robbery (theft and bodily injury). The deadly weapon allegations in the aggravated robbery count did not charge that Appellant caused serious bodily injury—only that he used either a television or his hand, that in the manner of their use or intended use were capable of causing death or serious bodily injury:

> intentionally or knowingly, while in the course of committing theft of property and with intent to obtain or maintain control of said property, cause *bodily injury* to another, Bruce Florence, by pushing Bruce Florence with a television set causing Bruce Florence to strike his head against the ground and [Appellant] used or exhibited a deadly weapon, to-wit:  a television set, that in the manner of its use or intended use *was capable of causing death or serious bodily injury*,

> Paragraph Two:  . . . intentionally or knowingly, while in the course of committing theft of property and with intent to obtain or maintain control of said property, cause *bodily injury* to another, Bruce Florence, by pushing Bruce Florence with his hand causing Bruce Florence to strike his head against the ground and [Appellant] used or exhibited a deadly weapon, to-wit:  his hand, that in the manner of its use or intended use *was capable of causing death or serious bodily injury*[.]  [Emphasis added].

The jury charge tracked the indictment, and the jury found Appellant guilty of aggravated robbery as alleged in the indictment's first count.  Appellant's third point challenging the sufficiency of the evidence to show that he caused serious bodily injury is overruled because the State did not allege that he caused serious bodily injury nor did the jury find that he did.

12

## Conclusion

Having overruled all of Appellant's points, we affirm the judgment of the trial court.

LEE GABRIEL
JUSTICE

PANEL:  DAUPHINOT, WALKER, and GABRIEL, JJ.

DAUPHINOT, J., filed a dissenting opinion.

PUBLISH

DELIVERED:  February 28, 2013



# COURT OF APPEALS
**SECOND DISTRICT OF TEXAS**
**FORT WORTH**

## NO. 02-11-00417-CR

WILLIAM ALAN KENNEDY                                              APPELLANT

V.

THE STATE OF TEXAS                                                    STATE

----------

FROM CRIMINAL DISTRICT COURT NO. 4 OF TARRANT COUNTY

----------

## DISSENTING OPINION

----------

I write separately in dissent, not because I believe that the majority has departed from the prevailing view of the law in the current war on crime, but because I believe, in our zeal, that we are in danger of going seriously astray from the fundamental protections envisioned by the framers of both our state and federal constitutions.

Although the State is not required to plead a separate culpable mental state in its deadly weapon allegation, that does not mean that the State is not

required to prove a culpable mental state. If a person is charged as a party to an offense involving a deadly weapon, the State must prove that he knew or should have known a deadly weapon would be used by a co-defendant to convict the party of the aggravated offense.[1] In *Tyra v. State*, the Texas Court of Criminal Appeals held that everything that causes death is a deadly weapon, no matter what its intended use.[2]

The question raised by the case now before this court is whether the actor has the protection afforded to a co-defendant of a person who uses a deadly weapon and to the defendant in general, or whether use or exhibition of a deadly weapon is a matter of strict liability. That is, must the actor know or should the actor know that what he is using is a deadly weapon?

Clearly, in *Tyra,* the defendant was aware that his vehicle was capable of causing death or serious bodily injury.[3] But if a parent gives a child a medication

---

[1]*See Stephens v. State*, 717 S.W.2d 338, 340 (Tex. Crim. App. 1986) (stating State must prove defendant was criminally responsible for aggravating element to convict him as party to aggravated offense); *Wooden v. State*, 101 S.W.3d 542, 547–48 (Tex. App.—Fort Worth 2003, pet. ref'd); *see also* Tex. Code Crim. Proc. Ann. art. 42.12, § 3g(a)(2) (West Supp. 2012) (providing trial court cannot grant community supervision to party who knew deadly weapon was going to be used or exhibited in commission of felony); *Gray v. State*, No. 02-08-00164-CR, 2009 WL 1905322, at *3 (Tex. App.—Fort Worth July 2, 2009, pet. ref'd) (stating State had to prove Gray criminally responsible for principal's use or exhibition of a deadly weapon during the offense to convict Gray as a party to felony murder based on the underlying felony of aggravated robbery).

[2]897 S.W.2d 796, 798 (Tex. Crim. App. 1995).

[3]*See id.*

2

prescribed by the treating physician and the child has an unanticipated allergic reaction and dies, has the parent used a deadly weapon to recklessly or negligently cause the child's death? The medication was capable of causing death or serious bodily injury because it did. Applying the reasoning of *Tyra*, the parent has used a deadly weapon on his or her child.[4]

Suppose a high school tennis player gets angry because he believes his opponent has been intentionally making bad calls, so the angry player throws a small athletic bag at his opponent, and unknown to our angry tennis player, the bag contains explosives that explode when they hit the other boy, killing him. Clearly our angry player has committed assault, but has he really used a deadly weapon? The question, then, is does the actor have to know or should he know that he is using a deadly weapon?

In the case now before this court, nothing explains how Appellant was supposed to know that using his hand to push himself away from the complainant was turning his hand into a deadly weapon in the manner of its use. Nothing in the record reflects any intent to cause death or serious bodily injury. Indeed, the complainant's fall resulted in death only because of his seriously compromised liver.

I believe that if an actor mistakenly thought that he was using a stage prop instead of a real revolver loaded with live rounds when firing at his antagonist in a

---

[4] *See id.*

3

play, he would be able to rely on the defense of mistake of fact.[5]  To me, that suggests that the actor must know or should have known that he was using a deadly weapon, not just something that could possibly be used in some manner to cause death or serious bodily injury.  That is, he must know or should have known either that the object was a deadly weapon or that it was being used in such a way as to be a deadly weapon.

From the first day of law school, we learn that there must be not only the actus reus, but also the mens rea.  We learn that statutes must be sufficiently specific to put the average person on notice of the prohibited conduct.  Is the requirement of mens rea really becoming a relic of the past so that our offenses are strict liability crimes requiring no intent or even negligence?  Are our offenses really becoming so vague that they are a question of how far the law can be stretched?

Clearly, Appellant knew that he was committing theft.  Clearly, he knew that pushing the complainant with his hand and hitting him with the box were both forms of assault.  And clearly, Appellant intentionally and knowingly committed robbery of the complainant.  But aggravated robbery with a deadly weapon?

---

[5]See Tex. Penal Code Ann. § 8.02 (West 2011); Gerber v. State, 845 S.W.2d 460, 467 (Tex. App.—Houston [1st Dist.] 1993, pet. ref'd) (noting that mistake-of-fact defense jury instruction instructed jury to acquit Gerber of murder if it found he had reasonable belief gun he used contained blanks).

4

Judge Onion and Judge Teague, where are you and your colors of amazement and concern?[6]

Because I believe that our federal and state constitutions require proof beyond a reasonable doubt that a person found to have used or exhibited a

---

[6]*See Port v. State*, 791 S.W.2d 103, 111 (Tex. Crim. App. 1990) (Teague, J., dissenting) (stating that if Presiding Judge Onion had been asked whether opinion he had authored in past implicitly overruled 100 years of case law and repealed 100 years of statutory law, he "would have uttered that famous comment of his: 'If that occurs, color me amazed, one more time.'"); *Ex parte McAfee*, 761 S.W.2d 771, 775, 783 (Tex. Crim. App. 1988) (Onion, P.J., dissenting) (noting that he was "dissent[ing] to express [his] concern" and stating, "My color is still amazed."); *Chapa v. State*, 729 S.W.2d 723, 729 (Tex. Crim. App. 1987) (Onion, P.J., dissenting) ("If you'll pardon an expression I use[,] 'Color me amazed one more time.'"); *Ex parte Johnson*, 697 S.W.2d 605, 616 (Tex. Crim. App. 1985) (Teague, J., dissenting) ("Presiding Judge Onion of this Court is often prone to utter, when he reads something in law that to him is without legal foundation: 'Color Me Amazed.' . . . I am compelled to echo Judge Onion's exclamation."); *Ex parte Green*, 688 S.W.2d 555, 558 (Tex. Crim. App. 1985) (Teague, J., dissenting) ("To make the analogy that the majority opinion does causes me to exclaim, 'Color me amazed.'"); *King v. State*, 687 S.W.2d 762, 767 (Tex. Crim. App. 1985) (Teague, J., dissenting to majority op. written by Onion, P.J.) ("Color me amazed, but do it in chartreuse."); *McClain v. State*, 687 S.W.2d 350, 357 (Tex. Crim. App. 1985) (Onion, P.J., dissenting) ("'Color me amazed' is not an adequate expression of concern here."); *Jenkins v. State*, 689 S.W.2d 216, 216 (Tex. Crim. App. 1984) (Teague, J., dissenting) ("When a majority of this Court does something that is totally inconsistent with a prior decision or decisions of this Court, our presiding judge exclaims[,] 'Color Me Amazed.' . . . I must echo the above statement.") (citations omitted); *Antunez v. State*, 647 S.W.2d 649, 651 (Tex. Crim. App. 1983) (Onion, P.J., dissenting) ("Color me amazed again, this time with a shade of deep concern."); *Malone v. State*, 630 S.W.2d 920, 922 (Tex. Crim. App. [Panel Op.] 1981) (Teague, J., dissenting) (discussing P.J. Onion's views of idem sonans and stating that they "leave[] one to express, 'Color Me Amazed One More Time.'") (citations omitted); *Lawson v. State*, 604 S.W.2d 91, 92 n.1 (Tex. Crim. App. 1979) ("Color me amazed at least one more time."); *Taylor v. State*, 508 S.W.2d 393, 397 (Tex. Crim. App. 1974) (Onion, P.J., dissenting) ("Color me amazed once again."); *Aldrighetti v. State*, 507 S.W.2d 770, 775 (Tex. Crim. App. 1974) (Onion, P.J., dissenting) ("Color me amazed.").

deadly weapon in the commission of an offense did so knowingly or should have known that he was doing so, I respectfully dissent.

LEE ANN DAUPHINOT<br>JUSTICE

PUBLISH

DELIVERED:  February 28, 2012