# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-14-00654-CR

**James Palacio, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 427TH JUDICIAL DISTRICT NO. D-1-DC-14-904021, HONORABLE JIM CORONADO, JUDGE PRESIDING

### M E M O R A N D U M   O P I N I O N

A jury found appellant James Palacio guilty of aggravated assault with serious bodily injury using a deadly weapon and involving family violence. *See* Tex. Penal Code § 22.02(b)(1). Appellant pleaded "true" to an enhancement paragraph alleging a prior felony conviction, and the jury assessed punishment at thirty years' imprisonment. *See id.* §§ 12.32, 12.42. In a single issue, appellant contends that the evidence is insufficient to show that he used or exhibited a deadly weapon in the commission of the offense. We will affirm the trial court's judgment of conviction.

### BACKGROUND

The record shows that appellant and a woman named Nicole McKee had dated each other and had a child together.[1] On January 30, 2013, appellant called 911 from his home, and when

---

[1] Because we must discuss the facts of this case in detail below in order to address appellant's sufficiency challenge, we limit our recitation of the facts here.

emergency personnel arrived at the home, they found McKee unresponsive and with extensive bruising on her body. McKee died later that day, and a medical examiner's testimony and photographs admitted into evidence at trial show that McKee had bruises on most parts of her body and more than twenty rib fractures. The medical examiner testified that her cause of death was "complications of blunt force chest injuries."

In interviews with detectives after McKee was transported to the hospital, appellant stated that he and McKee had been separated but that she had come back to his home to live with him and their child three days earlier. He initially stated that McKee was a heroin addict and that she left the home several times during the previous three days to use heroin, but he later changed his story, saying that he had not let her leave during the three days because he did not want her to use heroin. He admitted to physically taking hold of her on several occasions and to potentially causing injury to her ribs by falling on her.

After hearing the evidence, a jury convicted appellant of aggravated assault causing serious bodily injury using a deadly weapon and involving family violence. Appellant pleaded "true" to an enhancement allegation, and the jury assessed, and the trial court imposed, a thirty-year prison sentence. This appeal followed.

## DISCUSSION

Appellant contends that his conviction is unsupported by the evidence because the evidence is insufficient to prove that he used a deadly weapon in the commission of the offense. When reviewing the sufficiency of the evidence to support a conviction, we consider all the evidence in the light most favorable to the verdict to determine whether, based on that evidence and the

2

reasonable inferences that can be drawn from it, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Temple v. State*, 390 S.W.3d 341, 360 (Tex. Crim. App. 2013). In our analysis, we assume that the trier of fact resolved conflicts in the testimony, weighed the evidence, and drew reasonable inferences in a manner that supports the verdict. *Jackson*, 443 U.S. at 319; *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010). We may not substitute our judgment for that of the jury by reevaluating the weight and credibility of the evidence. *See King v. State*, 29 S.W.3d 556, 562 (Tex. Crim. App. 2000). The jury alone decides whether to believe eyewitness testimony, and it resolves any conflicts in the evidence. *See Hooper v. State*, 214 S.W.3d 9, 15 (Tex. Crim. App. 2007). We consider only whether the jury reached a rational decision. *See Isassi*, 330 S.W.3d at 638 ("Our role on appeal is restricted to guarding against the rare occurrence when a factfinder does not act rationally." (quoting *Laster v. State*, 275 S.W.3d 512, 517 (Tex. Crim. App. 2009))).

Legal sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge. *See Thomas v. State*, 444 S.W.3d 4, 8 (Tex. Crim. App. 2014) (citing *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)). "A hypothetically correct jury charge is one that 'accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried.'" *Id*. (quoting *Malik*, 953 S.W.2d at 240). The law as authorized by the indictment means the statutory elements of the charged offense as modified by the factual details and legal theories contained in the indictment. *See Daugherty v. State*, 387 S.W.3d 654, 665 (Tex. Crim. App. 2013).

3

The statute under which appellant was convicted states the following, in relevant part:

(a)    A person commits an offense if the person commits assault as defined in § 22.01 and the person:

   (1)    causes serious bodily injury to another, including the person's spouse; or

   (2)    uses or exhibits a deadly weapon during the commission of the assault.

(b)    An offense under this section is a felony of the second degree, except that the offense is a felony of the first degree if:

   (1)    the actor uses a deadly weapon during the commission of the assault and causes serious bodily injury to a person whose relationship to or association with the defendant is described by Section 71.0021(b) [dating relationship], 71.003 [family relationship], or 71.005 [household member], Family Code.

Tex. Penal Code § 22.02.

The indictment in this case alleged that appellant:

intentionally, knowingly, or recklessly cause[d] bodily injury to Nicole McKee, a member of [appellant's] family or household and with whom [appellant] had a dating relationship, by striking Nicole McKee with his hand, and by pushing Nicole McKee with his hand, and by grabbing Nicole McKee with his hand, and by grabbing Nicole McKee with his arm, and by pushing Nicole McKee with his body, and by striking Nicole McKee with his body, and by causing Nicole McKee to fall to the ground, and [appellant] did then and there use or exhibit a deadly weapon, to-wit: a hand, an arm, a body, and the ground, which in the manner of its use or intended use was capable of causing death or serious bodily injury, during the commission of said offense.

A "deadly weapon" is defined as "anything that in the manner of its use or intended use is capable of causing death or serious bodily injury." *Id.* § 1.07(a)(17)(B). In order to sustain a

4

deadly-weapon finding, the evidence must demonstrate that: (1) the object meets the definition of a deadly weapon; (2) the deadly weapon was used or exhibited during the transaction on which the felony conviction was based; and (3) other people were put in actual danger. *Brister v. State*, 449 S.W.3d 490, 494 (Tex. Crim. App. 2014). Objects that are not usually considered dangerous weapons may become so, depending on the manner in which they are used during the commission of an offense. *Drichas v. State*, 175 S.W.3d 795, 798 (Tex. Crim. App. 2005). For example, body parts, such as hands, may be deadly weapons based on their manner of use or intended use and their capacity to produce death or serious bodily injury. *See Lane v. State*, 151 S.W.3d 188, 191 (Tex. Crim. App. 2004); *Turner v. State*, 664 S.W.2d 86, 90 (Tex. Crim. App. 1983).

Several factors may be considered in determining whether an object is capable of causing death or serious bodily injury: (1) physical proximity between the victim and the object; (2) the threats or words used by the defendant; (3) the size and shape of the weapon; (4) the weapon's ability to inflict death or serious injury; (5) the manner in which the defendant used the weapon; and (6) the nature of the wounds inflicted. *See, e.g.*, *Lane*, 151 S.W.3d at 191; *Dominique v. State*, 598 S.W.2d 285, 286 (Tex. Crim. App. 1980); *Kennedy v. State*, 402 S.W.3d 796, 802 (Tex. App.—Fort Worth 2013, pet. ref'd); *Bailey v. State*, 46 S.W.3d 487, 491–92 (Tex. App.—Corpus Christi 2001, pet. ref'd); *Lozano v. State*, 860 S.W.2d 152, 156 (Tex. App.—Austin 1993, pet. ref'd); *see also Brown v. State*, 716 S.W.2d 939, 946–47 (Tex. Crim. App. 1986). No one factor is determinative, and each case must be examined on its own facts. *See Brown*, 716 S.W.2d at 946–47.

Considering the foregoing factors, and reviewing all of the evidence in the light most favorable to the verdict, we conclude that the record contains sufficient evidence to support the jury's

deadly-weapon finding. To begin with, there is evidence showing that McKee was uninjured before she went to appellant's home and that appellant was angry with her and wanted her to come to his home for several days before she arrived there. Specifically, a manager at a restaurant where McKee worked testified that the last day she worked before she died was January 27, 2013. He testified that he also worked that day, that he did not see any injuries on her body, that she did not complain about pain, and that she was able to physically conduct her job duties. He testified that she seemed distracted, however, and was "constantly" on her phone, so he sent her home early that day.

In text messages between appellant and McKee in the days leading up to her arrival at his home that were admitted into evidence at trial, appellant sent messages such as: "Now you Fuck up get here now nikky before it gets real bad now," "the longer I wait the more you going to get nikky on everything I love," "You going to get it," "Hope you take longer take longer just wait keep it up nikky. Ignore me to," "I know if you don't come now nikky you not be happy at all with me," "Know what you do come now I am going up to your work today and you ain't going to like it nikky." Some of McKee's responses to his messages include the following: "I know as soon there I'm gonna get my ass kicked," "And I deserve it but I'm sorry," "K Daddy I'll come home but please be nice," "I'll come now please don't be mean," "I'm scared jp I know it u mad j don't want u to be meant."

The record shows that appellant called 911 from his home on January 30, 2013. A paramedic who responded to the call testified that firefighters were already at the scene performing CPR on McKee when he arrived. He testified that the firefighters informed him that when they arrived, McKee "was unresponsive and pulseless, not breathing." He further testified that he noted on his report that she had "numerous deep, black-and-blue bruises about her entire body." A detective

6

who went to the hospital after McKee was transported there testified that he stayed at the hospital for "several hours" and that the doctors "were losing [her] pulse several times and had to revive her several times." He testified that McKee died later that night. He further testified that a hand, arm, body, or the ground could be a deadly weapon if they were used in a manner capable of causing death or serious bodily injury.

The medical examiner who conducted an autopsy on McKee testified that she had numerous bruises on her body. Specifically, photographs taken by the medical examiner and his report show that McKee had bruises on her head, shoulders, back, arms, chest, stomach, buttocks, and the front and back of both of her legs. The medical examiner further testified that McKee had eleven fractures to her ribs on the left side of her body, including one "floating rib," which he testified was "when you have a fracture of a rib in two spots so it's literally just floating." He testified that McKee also had eleven fractures to her ribs on the right side of her body, including three "floating ribs." He testified that a person with McKee's rib injuries "would have difficulty breathing" and be in "a lot of pain." He further testified that he "wouldn't expect too much mobility" because "any time [the person] took a breath in it's going to hurt." He testified that McKee had morphine, methamphetamine, and promethazine in her body but no heroin. McKee's cause of death, according to the medical examiner's testimony, was "complications of blunt force chest injuries." The medical examiner further testified that "pretty much anything" could be a deadly weapon if used in a manner capable of causing death or serious bodily injury, including hands, arms, a body, or the ground.

In appellant's first interview with detectives, he stated that McKee was a heroin addict and had come to his house three days earlier but had left multiple times to get heroin. Later in the

7

interview, he admitted that he had lied about her leaving, stating that she never left the house in the three days she was there. He said that she had asked him to help her stop using heroin and that he had physically kept her from leaving his home so that she would not use heroin. He also said that he gave her numerous drugs during the three days she was there, including morphine, methamphetamine, and promethazine (the same ones found in her body at her autopsy), in an attempt to get her to stop using heroin. Appellant further told police that he was six feet four inches tall and weighed about 198 pounds. The medical examiner testified that McKee was about five feet two inches tall and weighed 145 pounds.

Further specific statements made by appellant during his first interview with detectives include the following: he physically tried to keep McKee from leaving his house several times during the previous few days; he "landed on top of her a couple times"; landing on top of her was "probably when she hurt her chest"; he was "grabbing her, trying to hold her down"; he held her, they went to the ground, they "hit stuff, walls"; he was bear hugging her and held her "probably too hard"; he fell on top of her, and she was having trouble breathing after that; she told his mother (with whom he lived) that he would not let her leave and that he was holding on to her and hitting her too much; he "might have held her a little too hard, went to the ground, rolled around, bumped here, bumped there"; and she "hit the floor real hard."

In the detectives' second interview of appellant, which occurred at appellant's house, appellant made the following statements: "she could have hit her head here, here, here [in the bathroom]" while he tried to hold her down; he "grabbed her and helped give all the bruises"; she was "complaining about her ribs" and she said "[he] broke some when [they] hit the ground"; after they

hit the ground, "she gasped, she was having trouble breathing"; she said her ribs "felt broken"; he listened to her chest and "could hear [her ribs] moving"; he "heard something [when she breathed], so [he thought] something was wrong with her lungs"; and "it sounded like she couldn't breathe because [he] fell on her." He further stated that "[i]t happened here [outside the home], and it happened over here, and once in the house . . . it happened three times"; that he grabbed her, "[they] went down," and then his "elbow went up into her chest like that . . . this is when she started complaining about it . . . said she was having trouble breathing . . . then I listened to her, it sounded like she was having trouble breathing . . . I thought it was the drugs, so we went on and let it go, went on, let it go"; that "it felt like [her ribs] move[d]"; that the injuries were "because [of] landing on top, all that weight, force going down, she's a little bitty girl"; that he "probably held her a little too hard"; and that he thought the cause of death "was because of the ribs . . . when we fell, she started complaining right afterwards . . . she said she couldn't breathe, and I just thought she was doing that so, you know, she could get out of the house."

Appellant also stated that the first altercation, which he said was the one that caused the rib injuries, occurred early in the day on Tuesday, which was the day before he called 911. In reference to her difficulty breathing and complaints about her ribs, he said that "she'd been like that for a couple days" before he called 911. He said that the "pills were covering up the pain," but that McKee complained Tuesday night and that he said, "Alright, we'll go [to the hospital]," but then he "was tired and went to sleep." He said he was going to take her to the hospital on Wednesday but that she "fell out." He said "she tried to get back up, but then she fell down again."

Considering all of the evidence in the light most favorable to the verdict —including the text messages sent between appellant and McKee in the days before she returned to his home, the multitude of rib fractures and bruises on McKee's body at the time of her death, the medical examiner's conclusion that the cause of McKee's death was complications from blunt force chest injuries, the medical examiner and detective's testimony that a hand, arm, body, or the ground could be a deadly weapon if used in a manner capable of causing death or serious bodily injury, the evidence that appellant was considerably larger than McKee, and appellant's admissions that he "bear-hugged" McKee, that he physically kept her from leaving his home for three days, that he fell on top of her and physically struggled with her on at least three separate occasions, that his elbow went into her chest when he fell on her, that she gasped and had trouble breathing after that, that he listened to her chest and could hear her ribs moving, that she complained about the pain, and that the rib injuries occurred at least twenty-four hours before he called 911—and considering the reasonable inferences that can be drawn from that evidence, we conclude that the jury could have found beyond a reasonable doubt that appellant used his hand, arm, body, or the ground as a deadly weapon during the commission of an assault on McKee. *See* Tex. Penal Code § 1.07(a)(17)(B); *Jackson*, 443 U.S. at 319; *Temple*, 390 S.W.3d at 360; *Drichas*, 175 S.W.3d at 798; *Lane*, 151 S.W.3d at 191–92; *Turner*, 664 S.W.2d at 90; *Brantley v. State*, No. 05-13-00225-CR, 2014 WL 545514, at *3–4 (Tex. App.—Dallas Feb. 10, 2014, no pet.) (mem. op., not designated for publication); *Quincy v. State*, 304 S.W.3d 489, 500–01 (Tex. App.—Amarillo 2009, no pet.); *Goode v. State*, No. 03-10-00254-CR, 2011 WL 477038, at *5 (Tex. App.—Austin Feb. 9, 2011, no pet.) (mem. op., not designated for publication); *Hemphill v. State*, No. 08-03-00054-CR, 2004 WL 722247, at *4–5 (Tex. App.—El

Paso Apr. 1, 2004, pet. ref'd) (mem. op., not designated for publication). Accordingly, we overrule appellant's sole issue.

## CONCLUSION

We affirm the trial court's judgment of conviction.

_____

Cindy Olson Bourland, Justice

Before Justices Puryear, Goodwin, and Bourland

Affirmed

Filed: October 31, 2016

Do Not Publish

11