

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-19-00194-CR
No. 02-19-00195-CR

_____

JAMES EDWARD JOHNSON, Appellant

V.

THE STATE OF TEXAS

On Appeal from the 432nd District Court
Tarrant County, Texas
Trial Court Nos. 1536772D, 1536776D

Before Kerr, Birdwell, and Womack, JJ.
Memorandum Opinion by Justice Womack

## MEMORANDUM OPINION

### I. INTRODUCTION

A jury convicted appellant James Edward Johnson of a second-degree-felony count of aggravated assault, of a third-degree-felony count of assault, and a state-jail-felony count of interfering with an emergency call. *See* Tex. Penal Code Ann. §§ 22.01(a)(1), (b)(2)(A), 22.02(a)(2), (b), 42.062(a), (c). The trial court sentenced him to forty years' confinement on each of the assault and aggravated assault counts and to twenty years' confinement on the count for interfering with an emergency call.[1] Johnson raises two issues on appeal. In the first, he challenges his aggravated-assault conviction, arguing that the evidence is insufficient to support the jury's deadly-weapon finding relating to that offense. In the second, he argues the trial court reversibly erred by granting the State's motion asking the trial court to release a copy of the jury list to the State. We affirm.

### II. BACKGROUND

At approximately 7:12 p.m. on March 6, 2018, an Arlington 9-1-1 dispatcher answered a call from Johnson's girlfriend of four years (Girlfriend), who said, "Yeah, I need help," and then stated the address of an Arlington residence. As the dispatcher attempted to clarify the address, she was interrupted by Girlfriend's frantic and

---

[1]With respect to all three charges, the State alleged that Johnson had been previously convicted of two other felony offenses. The trial court found those enhancement allegations to be true, thereby increasing the potential range of punishment for each offense. *See id.* §§ 12.42(d), .425(b).

2

repeated screams of "Help!" Between her cries for assistance, Girlfriend managed to relay that a man had kicked her in the ribs, that there was glass everywhere, that she was bleeding, and that the man was trying to kill her. Girlfriend shouted that her daughter was also in the house and pleaded for the dispatcher to send assistance. About a minute and twenty seconds into the call, Girlfriend yelled out the name of the person who was attacking her, "James Johnson," and gave his date of birth. In the background, Girlfriend's daughter said something to Girlfriend, and Girlfriend replied, "No, darling, go back in your room," and told her to close the door. Girlfriend tried to continue communicating with the dispatcher, but those efforts abruptly ceased after she screamed, "No! No! No!" while apparently tussling with her attacker, at which point the phone line went dead. The dispatcher attempted to call Girlfriend back multiple times, but nobody answered.

The dispatcher sent police officers and emergency medical services to the residence Girlfriend had identified. While those first responders were en route, a second 9-1-1 call related to the residence came in, this one placed by Johnson. He told the dispatcher that he wanted to report Girlfriend for assaulting him. According to Johnson, he and Girlfriend lived together at the residence, but he had discovered that she had another man over at the house. Johnson stated that he was just about to fight with the other man for being at the house when Girlfriend hit him on the head with a bat. Johnson further said that Girlfriend had threatened to get a knife, so he

left the residence because he did not want to get stabbed. The call disconnected, and although the dispatcher tried to call Johnson back, he did not answer.

A couple of minutes later, with first responders still yet to arrive at the scene, a third 9-1-1 call came in. Girlfriend's young daughter made this call, and she told the dispatcher that she needed an ambulance to come to the residence because Girlfriend was hurt. Girlfriend was talking in the background, and she eventually took the phone from her daughter and spoke with the dispatcher, reiterating that she needed an ambulance. The dispatcher asked Girlfriend to tell him exactly what had happened, but she would not discuss the details except to say that she felt "a little dizzy," and she asked that the dispatcher send help. As the dispatcher attempted to acquire more information, Girlfriend became emotional and stated that she was not having a medical emergency but that instead she had been hit several times. Girlfriend remained on the phone with the dispatcher until first responders arrived.

Gretchen Weller was one of the Arlington police officers who responded to the residence. When Officer Weller saw Girlfriend, she could see that Girlfriend had suffered extensive injuries: Girlfriend's lip was so swollen that she could not close her mouth; her eyes were blackened; her balance was off to the point that she could not move around without assistance; her arms were scratched; and her body was bruised and swollen. Officer Weller also noticed that "a figurine or a potted plant or a vase or some object" was shattered on the floor. In addition, under some pillows on the sofa, officers found a bloody metal rod that was typically used to secure a sliding glass door

4

in the residence. And they further discovered a cell phone that was completely broken in half, with each half buried between different portions of the sofa's cushions.

Girlfriend's injuries were so severe that she had to be transported to the hospital, and Officer Weller followed Girlfriend to the hospital and joined her in her hospital room while she was waiting for medical treatment. Girlfriend expressed to Officer Weller that she was scared and afraid, and she also requested an emergency protective order. Girlfriend also said that if she told Officer Weller what had happened to her, it would only make things worse for her. But eventually Girlfriend opened up to Officer Weller and said that Johnson had hit her multiple times, that Johnson had abused her many times over the years, and that she did not usually call 9-1-1 because she feared doing so would only make things worse for her.

Of the incident that had led to her hospital visit, Girlfriend told Officer Weller that she had arrived at home later than usual because the traffic lights at a particular intersection along her route had not been working. Girlfriend told Officer Weller that when she got home, Johnson was upset with her because he believed she had been late because she was cheating on him. Girlfriend said that Johnson wanted to see her phone and that Johnson then escalated to physically assaulting her.

With respect to the physical altercation, Girlfriend said that Johnson punched her several times with his closed fist and that he picked her up and threw her down on the ground, causing her to hit a flowerpot, which shattered on the ground. Girlfriend

said that Johnson then sat on her, using his body weight to keep her from getting up. Girlfriend said that she then called 9-1-1 and that while she was on the phone, Johnson grabbed the phone and began hitting her with the metal security rod. Girlfriend indicated to Officer Weller that Johnson had hit her with the metal security rod because she was on the phone with 9-1-1.

Officer Weller asked Girlfriend about the story Johnson had given the dispatcher during his 9-1-1 call. Specifically, she asked Girlfriend whether there had been a fight between two men at the residence. Girlfriend was confused by the question, had no knowledge about what Officer Weller was talking about, denied that there was a fight between two men at the residence, and denied that a second man was even at the residence when Johnson assaulted her. In an attempt to make sense of Officer Weller's question, Girlfriend began guessing that perhaps her ex-husband or her neighbor had gone over to the residence after she had left for the hospital.

Girlfriend told Officer Weller that she did not want Johnson prosecuted for assaulting her. She said that she did not want to have family members retaliate against her or to cause more trouble for herself by having Johnson prosecuted. Girlfriend told Officer Weller that she instead wanted an emergency protective order.

### III. DISCUSSION

#### A. Evidentiary Sufficiency: Deadly-Weapon Finding

In his first issue, Johnson argues the evidence is insufficient to support his conviction for aggravated assault. As applicable here, to convict Johnson of

6

aggravated assault, the jury had to find that he (1) assaulted Girlfriend under Penal Code Section 22.01(a) and (2) used or exhibited a deadly weapon while doing so. *See id.* § 22.02(a)(2); *see also Hernandez v. State*, 556 S.W.3d 308, 314 (Tex. Crim. App. 2017) ("Under [Texas Penal Code] Section 22.02(a)(2), a simple assault becomes aggravated if the assailant uses or exhibits a deadly weapon in committing the assault."); *Karl v. State*, No. 02-16-00001-CR, 2016 WL 5443116, at *2 (Tex. App.—Fort Worth Sept. 29, 2016, no pet.) (mem. op., not designated for publication) ("A person commits aggravated assault by intentionally or knowingly causing bodily injury to another while using or exhibiting a deadly weapon."). The object alleged to have been a deadly weapon here is the metal security rod that officers found lying on the sofa after they responded to the residence where the assault took place. Johnson maintains that the evidence is insufficient to support the jury's finding that this metal security rod qualified as a deadly weapon.

### 1. Applicable law and standard of review

In our evidentiary-sufficiency review, we view all the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the crime's essential elements beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 316, 99 S. Ct. 2781, 2787 (1979); *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017). This standard gives full play to the factfinder's responsibility to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable

inferences from basic facts to ultimate facts. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Queeman*, 520 S.W.3d at 622.

The Penal Code's definition of "[d]eadly weapon" includes "anything that in the manner of its use or intended use is capable of causing death or serious bodily injury." Tex. Penal Code Ann. § 1.07(a)(17)(B). In establishing that a particular object is a deadly weapon, the State does not have to prove that the object's use or intended use actually caused death or serious bodily injury; rather, the State need only prove that the object's use or intended use was capable of causing death or serious bodily injury. *Tucker v. State*, 274 S.W.3d 688, 691 (Tex. Crim. App. 2008). In determining whether the State has met that burden, a jury may consider (1) the physical proximity between the alleged victim and the object, (2) any threats or words used by the accused, (3) the size and shape of the object, (4) the potential of the object to inflict death or serious injury, and (5) the manner in which the accused allegedly used the object. *Kennedy v. State*, 402 S.W.3d 796, 802 (Tex. App.—Fort Worth 2013, pet. ref'd).

### 2. The evidence is sufficient to support a finding that Johnson used the metal security rod during the assault.

Johnson's sufficiency challenge is grounded primarily (if not solely) on his contention that there was no evidence introduced at trial showing how he used the metal security rod during the assault of Girlfriend. He suggests this fact alone establishes that the evidence was insufficient to support a finding that the metal

8

security rod was a deadly weapon, arguing that "because there is no testimony concerning how [he] used the rod or pole," the ordinary factors for determining whether an object is a deadly weapon are inapplicable.

But Johnson is mistaken in his assertion that there was no evidence from which the jury could ascertain the manner in which he used the metal security rod. The State introduced medical records related to the treatment paramedics provided to Girlfriend after the assault, and those records show that Girlfriend told the paramedics that she had been attacked, and that while she was on the phone with 9-1-1, she had "got[ten] hit with a bat" three to four times in the head. The State also introduced medical records related to Girlfriend's visit to the hospital shortly after the assault, and those records show that Girlfriend's complaints included head and facial pain stemming from an assault in which she had been "hit with a metal pipe."

Another portion of those records reflects that Girlfriend's chief complaint was "Domestic Abuse/hit to heads [sic]." Girlfriend's mother testified that she saw Girlfriend in the hospital after the assault, and she told the jury that Girlfriend had sustained injuries to her face that had rendered her "unrecognizable" and that Girlfriend's face "was all swollen up." Girlfriend's mother also testified that Girlfriend had told her that Johnson was the one who had caused the injuries. Additionally, the State presented the testimony of Officer Weller, who told the jury that a short time after the assault took place, Girlfriend told her that Johnson had hit her with the metal security rod when she attempted to call 9-1-1. And Sergeant

9

Christin Pritchett, an officer with the Arlington police department, also testified that Johnson used the metal security rod to strike Girlfriend on her head.

To support his argument that there is no evidence as to how he used the metal security rod, Johnson primarily points to Girlfriend's trial testimony, specifically her testimony that another man named Trey had hit her with the metal security rod, not Johnson. During trial, Girlfriend testified that on the date of the assault, she invited Trey to the residence and that when Johnson came home from work and saw Trey was there, Johnson got angry and started to fight with Trey. Girlfriend said that she had tried to break up the fight and that in the course of her doing so, Trey grabbed the metal security rod and hit her with it. Girlfriend said at trial that "Trey had the pole the whole time" and that Johnson "never had the pole." Johnson suggests that the jury could have inferred that he hit Girlfriend with the metal security rod only through pure speculation.

The evidence we have already outlined contradicts Girlfriend's trial testimony that Johnson did not hit her with the metal security rod during the assault. But we note that the jury heard even more evidence that contradicted the details of Girlfriend's trial testimony, particularly her claim that a third person was involved in the assault at the residence. For example, the jury heard a 9-1-1 call in which Girlfriend identified Johnson as her attacker by yelling out his name and date of birth, and she did not mention to the dispatchers during either of her 9-1-1 calls anything about a third person being involved in the assault.

10

Additionally, Officer Weller told the jury that while interviewing Girlfriend in the hospital shortly after the assault, she asked Girlfriend about the story Johnson had told the dispatcher during his own call to 9-1-1, namely, that he had gotten into a fight with another man at the residence. According to Officer Weller, Girlfriend denied there was another man at the residence, was confused by the suggestion that there was, and insisted that Johnson was the person who had assaulted her. The jury also learned that Girlfriend had expressed that she did not want Johnson prosecuted but that she did not base that desire on an assertion that it was actually Trey who had assaulted her; rather, she said she did not want Johnson prosecuted because she was afraid, because she did not want family members to retaliate against her, and because she did not want to cause more trouble for herself. Officer Weller testified that based upon her experience—which included working on "[h]undreds, if not close to a thousand" domestic violence cases in her twelve-year career—she did not believe that any other man besides Johnson was at the residence when the assault took place.

The jury was not bound to believe the version of the assault that Girlfriend conveyed during trial. Given all of the other evidence presented at trial, Girlfriend's trial testimony merely created a conflict in the evidence as to whether Johnson did or did not hit her with the metal security rod during the assault. It was the jury's sole province to resolve that evidentiary conflict, and in our analysis we must presume that the jury resolved the conflict in favor of its verdict. *See Queeman*, 520 S.W.3d at 622 (noting that "[t]he jury is the sole judge of the credibility of witnesses and the weight

11

to be given to their testimonies" and that "[w]hen the reviewing court is faced with a record supporting contradicting inferences, the court must presume that the jury resolved any such conflicts in favor of the verdict, even if not explicitly stated in the record"). Here, that means we must presume the jury believed the evidence showing that Johnson hit Girlfriend multiple times with the metal security rod during the assault, a finding that is amply supported by the evidence we have outlined. *See id.*

### 3. The evidence is sufficient to support a finding that the metal security rod constituted a deadly weapon.

As noted above, Johnson appears to base his sufficiency challenge on the sole contention that there was no evidence concerning the manner in which he used the metal security rod, a contention we have rejected. Johnson does not contend in his brief that an analysis of the typical factors for determining an object's deadly-weapon status weigh against the jury's deadly-weapon finding here. *See Kennedy*, 402 S.W.3d at 802 (identifying five factors a jury may consider in determining whether an object is a deadly weapon). To the contrary, Johnson expressly argues that these factors are inapplicable to this case. Nevertheless, to the extent that Johnson's brief could be understood as arguing that application of the deadly-weapon factors weighs against the jury's deadly-weapon finding, we disagree.

The first factor is the physical proximity between the alleged victim and the object. *Id.* As outlined above, there was evidence showing that Johnson hit Girlfriend on the head with the metal security rod multiple times during the assault.

Thus, the proximity factor weighs in favor of the jury's deadly-weapon finding. The second factor looks to any words or threats from the accused, but the record here does not contain any such evidence. *See id.*

Next we consider the third and fourth factors—the size and shape of the object and the object's ability to inflict death or serious injury. *See id.* As we have noted, the jury heard that the rod Johnson used in the assault was made of metal and was likely used to secure a sliding glass door within the residence. The State introduced not only photographs of the metal security rod but also the metal security rod itself, and the State handed it to the jurors to pass among themselves while Sergeant Pritchett testified, which allowed them to experience first-hand its size and shape. As the jurors passed the metal security rod among themselves, Sergeant Pritchett opined that it was capable of causing death or serious bodily injury if a person used it in the manner Johnson had against Girlfriend. Sergeant Pritchett also noted that that one of the photographs depicted what appeared to be blood on the metal security rod. Based on this evidence, the jury could have rationally determined that the third and fourth factors weighed in favor of a finding that the metal security rod was a deadly weapon.

The fifth factor is the manner in which the defendant used the object. *See id.* We have already detailed the evidence supporting a finding that Johnson hit Girlfriend on the head with the metal security rod multiple times, and we need not repeat that evidence here. Based on that evidence, a jury could have reasonably concluded that

13

the fifth factor weighed in favor of finding that the metal security rod was a deadly weapon.

In sum, viewed in the light most favorable to the verdict, a rational juror could have concluded that Johnson used a deadly weapon when assaulting Girlfriend. Accordingly, the evidence is sufficient to sustain the jury's deadly-weapon finding. *See Jackson*, 443 U.S. at 316, 99 S. Ct. at 2787; *Queeman*, 520 S.W.3d at 622. We therefore overrule Johnson's first issue.

## B.    Release of Juror Information

In his second issue, Johnson contends the trial court abused its discretion by granting the State's motion to release juror information. The State filed that motion pursuant to Code of Criminal Procedure Article 35.29, and it sought a copy of the jury list, stating that "[g]ood cause exists for the request of this information in that the State intends to use this information for the legitimate purpose of sending out jury letters to inform Jurors of possible post[-]trial remedies and their rights concerning those remedies." *See* Tex. Code Crim Proc. Ann. art. 35.29.

We begin by addressing the State's suggestion that Johnson's second issue is moot. The State contends that it received the jurors' information on May 3, 2019, or May 4, 2019, and that it mailed the letters to the jurors no later than May 7, 2019.[2]

---

[2]We note that the State does not cite any portion of the record to support these factual representations. The State's contention that Johnson's second issue is moot is based upon these facts, and a claim of mootness challenges our authority to render an opinion as to this allegedly-moot issue. *See Gordy v. State*, Nos. 12-14-00062-CR, 12-

14

The State argues that because the jurors have already received those letters, Johnson's issue is moot. But this misapprehends the nature of Johnson's complaint. By his second issue, Johnson does not seek to prevent the jurors from receiving the letters from the State. Rather, he claims that the trial court's abuse of discretion in granting the State's motion to release juror information should result in a reversal of his convictions and a new trial because it somehow affected the trial court's judgments. That claim is not mooted by the fact that the jurors may have already received letters from the State. We conclude this issue is not moot.

Both Johnson and the State note that in our recent decision in *Onick v. State*, we addressed an identical complaint to the one Johnson has raised in his second issue. *See* No. 02-18-00356-CR, 2019 WL 1950063, at \*5–6 (Tex. App.—Fort Worth May 2, 2019, no pet.) (mem. op., not designated for publication). There, we observed that Article 35.29 authorizes the release of juror information only upon a showing of good cause by a party in the trial or a bona fide member of the news media. *See id.* at \*5. We concluded that the State's motion there did not establish good cause because it was unsworn, it was not supported by any evidence, and it simply asserted without specificity that the State needed the jurors' information in order to send out letters

---

14-00063-CR, 2015 WL 858919, at \*2 (Tex. App.—Tyler Feb. 27, 2015, no pet.) (mem. op., not designated for publication). Our own review of the record did not reveal anything affirmatively showing when the State received the jurors' information; when, if ever, the State mailed the letters to the jurors; or when, if ever, the jurors received those letters.

regarding possible post-trial remedies and associated rights. *Id.* at *6. We therefore concluded that the trial court had abused its discretion by granting the motion. *See id.*

The State candidly admits that its motion in this case was essentially identical to, and suffered from the same deficiencies as, the one we found wanting in *Onick*. And it concedes that under our holding in *Onick*, which it does not challenge here, Johnson is correct that the trial court abused its discretion by granting the motion for juror information. We agree. But that does not end our inquiry, for we will not reverse a trial court for nonconstitutional error unless the error affected the defendant's substantial rights. *See* Tex. R. App. P. 44.2(b); *see also Onick*, 2019 WL 1950063, at *6 (overruling the appellant's complaint about the trial court's release of juror information because although the trial court abused its discretion by releasing that information, the appellant made no showing that the error affected his substantial rights).

An error that has a "substantial and injurious effect or influence in determining the jury's verdict" affects a substantial right. *Haley v. State*, 173 S.W.3d 510, 518 (Tex. Crim. App. 2005); *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997) (citing *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S. Ct. 1239, 1253 (1946)). Conversely, an error does not affect a substantial right if we have "fair assurance that the error did not influence the jury, or had but a slight effect." *Solomon v. State*, 49 S.W.3d 356, 365 (Tex. Crim. App. 2001); *Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998). In determining the likelihood that a nonconstitutional error adversely affected the

16

jury's decision, we review the record as a whole. *Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002).

Johnson suggests that he was harmed by the trial court's release of juror information because his review of the record causes him to think that he might need to file a future postconviction writ of habeas corpus predicated on a claim that he received ineffective assistance of counsel. He postulates that as part of filing that writ, he might need to speak to the jurors about whether any outside influence was improperly brought to bear upon any juror. And he hypothesizes that the jurors' receipt of a letter from the State informing them of "possible post[-]trial remedies and their rights concerning those remedies" would, for some unspecified reason, cause those jurors to be reluctant to talk with Johnson's legal counsel concerning any future postconviction habeas writ.

We are not persuaded by these arguments. In the first place, they address entirely speculative harm in the future. But even more importantly, these arguments do not advance an appropriate harm analysis. As noted above, in determining whether a nonconstitutional error affected a defendant's substantial rights, we look to whether the error had a substantial and injurious effect or influence in determining the jury's verdict. *See Haley*, 173 S.W.3d at 518; *King*, 953 S.W.2d 266 at 271. Thus, Johnson's theory that the trial court's error here could possibly have a negative impact on a future habeas writ that he may (or may not) file misses the mark.

Applying our standard harm analysis, we are satisfied that the trial court's erroneous granting of the State's motion for the release of juror information did not have any effect on the jury verdicts at issue here. The record reflects that the guilt–innocence phase of Johnson's trial commenced on April 30, 2019, and that the jury returned its guilty verdicts on May 2, 2019, after deliberating from 2:18 p.m. to 4:24 p.m. The trial court then discharged the jury. The record shows that the trial court also signed the order granting the State's motion on May 2, 2019, but there is nothing in the record to indicate that it did so before discharging the jury. Nor is there anything in the record to suggest that any juror was made aware prior to discharge that the State sought to obtain the jurors' information. And while Johnson's punishment hearing occurred on May 3, 2019—the day after the trial court signed the order granting the State's motion—Johnson elected to have his punishment assessed by the trial court, not the jury. These facts leave us with a fair assurance that the trial court's error in granting the State's motion to release juror information did not influence the jury's guilty verdicts in either of the underlying cases. Thus, we must disregard the error. *See* Tex. R. App. P. 44.2(b). We overrule Johnson's second issue.

## IV. CONCLUSION

Having overruled all of Johnson's issues, we affirm the trial court's judgments. *See* Tex. R. App. P. 43.2(a).

18

/s/ Dana Womack

Dana Womack
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered:  March 5, 2020